The People of the State of New York ex rel. New York Central and Hudson River Railroad Company, Appellant, *v.* Michael J. Walsh, Acting Comptroller of the State of New York, et al., Respondents.
(Sterling Creek Case.)

Canals — railroads — appropriation of right of way of railroad for canal — construction of railroad bridge over and across canal — agreement by state officials and canal board to convey to railroad company land for new right of way in exchange for old right of way and to pay company for all damages caused by the change of route — constitutional law — such agreement valid and not violative of State Constitution — when railroad company entitled to mandamus to compel performance of such agreement.

1. The route of the improved Erie or barge canal, as fixed under chapter 147 of the Laws of 1903, intersected the land constituting the right of way of the relator, and the state duly appropriated the part of such land required for the construction of the canal at that point. Subsequently an agreement containing mutual stipulations was executed by the relator and by one of the defendants on behalf of the state, which was duly approved by the superintendent of public works and the canal board, and the plans for the construction of the overhead crossing of the canal by the relator's railroad

were reapproved by the superintendent of public works and the state engineer and surveyor. The relator wholly performed the agreement. The state refuses to perform, asserting its invalidity. The relator seeks by this proceeding to compel the state to perform. The purpose and effect of section 8, article 7 of the State Constitution is that the canals therein named should forever remain the property of the state, and under its management and in no wise or particular be transferred to corporations or individuals. (Canal Law [Cons. Laws, ch. 5], § 35; Railroad Law [L. 1890, ch. 565], § 13.) It does not interdict the legislature from authorizing the appropriation of an estate less than the fee in the lands required for the canals. Hence the provision of the contract requiring the state to convey to the relator by a quitclaim deed a permanent easement to use for railroad purposes the land of relator's right of way which was appropriated by the state does not violate this provision, nor does chapter 147 of the Laws of 1903 require the acquisition and retention of a title in fee to the lands appropriated under it. The state engineer and surveyor was authorized under the statutes to determine not only the lands, structures and waters, but also the estate or interest therein required for the use of the improved canals. (General Construction Law, § 40; Cons. Laws, ch. 22; L. 1903, ch. 147, § 4; Canal Law, §§ 80, 83.)

2. The contract discloses that the parties thereto intended that the canal was to be constructed, maintained and operated and was to be controlled, possessed and occupied by the state, and that the railroad of the relator should be constructed across and over it and upon the lands as delineated by the plans. They did not intend or agree that the state should convey to the relator any interest or estate in the lands of the canal which would enable or permit the relator to own in fee, or control or occupy any part of the lands within the prism or essential to the use or purposes of the canal, and, therefore, the Constitution does not nullify the agreement.

3. Apart from the restrictions imposed by the Constitution, the legislature is as free as is the individual to give authority to compromise and to adjust unliquidated liabilities or adverse demands and avoid thereby litigation, and properly evidenced it by empowering the special examiner and appraiser, the superintendent of public works and the canal board to make the contract in question. (L. 1908, ch. 195, amd. L. 1910, ch. 334.) The provisions of the agreement are consistent with and within those powers, and there is no use or exercise of the legislative act hazardous or harmful to the state.

4. The superintendent of public works, under the statutes and the agreement approved by him and the canal board, is under the legal duty to execute and deliver to the relator for and on behalf of the state the quitclaim deeds promised by the contract. (Canal Law, § 35; Railroad Law [L. 1890, ch. 565], § 4, subd. 4, § 13.)

*People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Walsh*, 159 App. Div. 252, reversed.

(Argued February 27, 1914; decided April 14, 1914.)

Appeal from an order of the Appellate Division of the Supreme Court in the third judicial department, entered January 7, 1914, which reversed solely on a question of law an order of Special Term granting a motion in behalf of the relator and appellant for a peremptory writ of mandamus to compel the defendant Walsh to audit a claim of relator and deliver to relator a warrant on the state treasurer for the amount audited, and the defendants Duncan W. Peck, superintendent of public works of the state, and William B. Milliman, special examiner and appraiser of canal lands, to execute and deliver to the relator quitclaim deeds on behalf of the People of the state granting to the relator an easement to use and occupy for railroad purposes certain lands.

The route of the improved Erie or barge canal, as fixed under chapter 147 of the Laws of 1903, intersected the land constituting the right of way of the relator near the city of Utica. November 16, 1909, the state duly appropriated the part of relator's land required for the construction of the canal at that place. In April, 1910, general plans for a permanent bridge to be constructed over and across the canal as a part of relator's right of way were approved by the relator and the proper state officials, but they were unable to fix by agreement the value of the land taken or the damages sustained by the relator by reason of the appropriation. They, however, agreed that the relator should proceed with the construction of the bridge and approaches in accordance with the adopted plans, and present its claim for its damages to the Court

of Claims under the authority contained in section 4 of the legislative act already named. In the year 1911 negotiations between the state officials and the relator were renewed and the agreement of July 27, 1911, upon which this proceeding is based, was their result. The agreement was executed by the relator and by the defendant Milliman on behalf of the state of New York, was duly approved by the superintendent of public works and the canal board, and the plans for the construction of the overhead crossing of the canal by the relator's railroad were reapproved by the superintendent of public works and the state engineer and surveyor. It in effect provides: The relator shall (a) erect and have ready for operation on or before August 1, 1912, maintain and own the bridge; (b) construct and in all things make ready for the work of the canal contractors at the site of the bridge on or before August 1, 1911, a detour on land to be furnished by the state carrying its tracks around the place where the bridge is to be constructed during the period of construction; (c) deliver to the state a full warranty deed of the land of its right of way appropriated. The state shall (a) deliver to the relator a quitclaim deed executed by its proper officers conveying a permanent easement to use and occupy forever for railroad purposes the appropriated land; (b) convey to the relator "a strip of land ten (10) feet in width on the northerly side of and adjacent to the lands" of relator, and "a strip of land fifteen (15) feet in width on the southerly side of and adjacent to the said lands" of relator, "both said strips to extend for the full length of the lands appropriated by the State of New York adjacent to the lands" of the relator; (c) pay the relator $352,993.50 "as and for all damages sustained by" the relator "by reason of the appropriation." Each of the strips of land mentioned in above subdivision "(b)" extends through and a considerable distance upon either side of the prism of the canal.

The relator wholly performed the agreement. The

state has not performed and upon proper demands refused to perform any part of it, because, as it asserts, it is invalid. The relator seeks by this proceeding to compel the state to perform.

*H. Le Roy Austin* for appellant. The contract, in so far as it provides for the conveyance to the relator of an easement for railroad purposes in certain canal lands, was authorized by statute, and in no manner violates the provisions of section 8 of article 7 of the State Constitution. (*P. P. T. & C. Co.* v. *O., etc., R. Co.*, 163 Fed. Rep. 967; *Butler* v. *Greene*, 65 Hun, 99; *People* v. *Fisher*, 190 N. Y. 468; *Benedict* v. *State*, 120 N. Y. 228; *Stewart* v. *State*, 105 N. Y. 254; *N. Y. C. & H. R. R. R. Co.* v. *City of Buffalo*, 200 N. Y. 113; *Matter of Mayor, etc.*, 52 Misc. Rep. 596; 198 N. Y. 606; *P. P. & C. I. R. R. Co.* v. *Williamson*, 91 N. Y. 552; *S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510; *Mott* v. *Eno*, 181 N. Y. 346.) The contract of July 27, 1911, is a valid and existing obligation of the state so far as the money damages are concerned. (N. Y. Const. art. 1, § 6; Lewis on Em. Domain [3d ed.], § 684; *City of Syracuse* v. *Stacey*, 45 App. Div. 249; 169 N. Y. 231; *Matter of Mayor, etc.*, 74 App. Div. 343; *Matter of Simmons*, 58 Misc. Rep. 581; *People ex rel. Rau* v. *York*, 31 App. Div. 527; *People ex rel. Kelley* v. *Common Council*, 77 N. Y. 503; *Matter of City of New York*, 125 App. Div. 219; 192 N. Y. 569; *People ex rel. Graves* v. *Sohmer*, 207 N. Y. 450; *People* v. *Stephens*, 71 N. Y. 527; *Danolds* v. *State*, 89 N. Y. 36; *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Sohmer*, 152 App. Div. 585.)

*Thomas Carmody, Attorney-General* (*Edward J. Mone* of counsel), for respondents. The contract of July 27, 1911, is invalid and unenforceable in so far as it provides for the delivery to relator of a quitclaim deed of a "permanent" or other easement to use and occupy for

railroad purposes canal lands, and in so far as it provides
for the conveyance to the relator of the fee title or other
interest in or to two lateral strips of land bisecting the
canal prism. (*Rexford* v. *Knight,* 15 Barb. 627; 11 N. Y.
308, 314; *Birdsall* v. *Cary,* 66 How. Pr. 358; *Heacock* v.
*State,* 105 N. Y. 246; *Eldridge* v. *City of Binghamton,*
120 N. Y. 309; *Sweet* v. *City of Syracuse,* 129 N. Y. 316,
334; *People* v. *Fisher,* 190 N. Y. 468; *Sweet* v. *B., N. Y.
& P. Ry. Co.,* 79 N. Y. 293; *Matter of N. Y. El. Lines
Co.,* 201 N. Y. 321; *Adirondack R. R. Co.* v. *Indian
River Co.,* 27 App. Div. 326.) The contract of July 27,
1911, is invalid and unenforceable in so far as it provides
for the payment of damages to the relator. (*People ex
rel. N. Y. C. & H. R. R. R. Co.* v. *Sohmer,* 152 App.
Div. 585; *C., B. & Q. R. R. Co.* v. *City of Chicago,* 166
U. S. 226; Sedgwick on Dam. [9th ed.] 1086; Lewis on
Em. Domain, 1291, § 733; Elliott on Railroads [2d ed.],
§§ 991, 1127; *B. & A. R. R. Co.* v. *Cambridge,* 159 Mass.
283; *I, C. R. R. Co.* v. *City of Chicago,* 48 N. E. Rep.
492; *C., M. & S. P. Ry. Co.* v. *City of Milwaukee,* 72
N. W. Rep. 1118; *Toledo, A. A. & M. Ry.* v. *D., L. &
N. R. R.,* 62 Mich. 564; *F. & P. M. R. R. Co.* v. *D. &
B. C. R. R. Co.,* 64 Mich. 350; *L. V. R. R. Co.* v. *State,*
204 N. Y. 471; *Matter of City of New York,* 125 App.
Div. 219.) The adoption by the canal board of the reso-
lution of August 30, 1911, approving the contract of
July 27, 1911, does not conclude the state. (Mechem on
Public Officers, § 828; *People* v. *Schoonmaker,* 13 N. Y.
238; *Ontario Knitting Co.* v. *State,* 205 N. Y. 409; *Wells*
v. *Johnston,* 171 N. Y. 324.)

COLLIN, J. The alleged invalidity of the agreement of
July 27, 1911, results, the learned attorney-general asserts,
from several of its provisions. He points out as invalid and
unenforceable the provision requiring the state to convey
to the relator by a quitclaim deed a permanent easement
to use for railroad purposes the land of relator's right of

**96** People ex rel. N. Y. C., etc., R. R. Co. *v.* Walsh.

[211 N. Y.]      Opinion, per Collin, J.      [April,

way which was appropriated by the state. It is, of course, conceded and expressed by the parties that the use and occupation of the land under the easement was that to be effected by the erection and maintenance of the bridge in accordance with the plans adopted by them. The making of the agreement and the approval or reapproval of the plans were dependent parts of one transaction, and by virtue of the statutes, which are operative in connection with the agreement, the superintendent of public works possesses a general supervisory power over the use and occupation by the relator in so far as may be necessary to preserve the free and perfect use of the canal or to make any repairs, alterations or improvements in the same. (Canal Law [Cons. Laws, ch. V], sec. 35; Railroad Law [Laws 1890, ch. 565], sec. 13.)

The argument of the attorney-general at this point is: The state is compelled by the Constitution (Art. 7, sec. 8) to acquire, vest and retain in the people of the state the fee simple to the appropriated land, and section 4 of chapter 147 of the Laws of 1903 is in accord with the constitutional purpose. This conclusion is erroneous. The constitutional provision referred to forbids the legislature from selling, leasing or otherwise disposing of the Erie canal, the Oswego canal, the Champlain canal, the Cayuga and Seneca canal or the Black River canal; "but they shall remain the property of the state and under its management forever." Its purpose and its effect is that those canals as highways of commerce, connecting the great lakes with the Atlantic ocean, should forever remain the property of the state, and under its management and in no wise or particular be transferred to corporations or individuals. (*Sweet* v. *City of Syracuse*, 129 N. Y. 316, 333, 339.) It does not relate to the quality of the title acquired or held by the state to the canal lands, but secures to the state the control, regulation and management of the canals so long as they are channels of transportation. It does not interdict the legislature from

authorizing the appropriation of an estate less than the fee in the lands required for the canals. Were the contrary true, the frequent legislative grants of power to transportation companies to construct their lines across the canals would be constitutionally invalid, because while a grant of such power is a franchise the exercise of it by constructing the crossing and the resulting actual use and occupation is the acquisition of an easement or interest in the canal lands. The constitutional provision did not prohibit the state from agreeing to convey to the relator the permanent easement in the appropriated lands.

Chapter 147 of the Laws of 1903 does not require the acquisition, and as a reasonable conclusion through implication the retention of a title in fee to the lands appropriated under it. Section 4 thereof authorizes the state engineer to " enter upon, take possession of and use lands, structures and waters, the appropriation of which for : the use of the improved canals and for the purposes of the work and improvement authorized by this act, shall in his judgment be necessary," and directs him to make " an accurate survey and map of all such lands " and annex thereto his certificate "that the lands therein described have been appropriated." It directs the superintendent of public works, in whose office a certified duplicate copy of the map and certificate of the state engineer must be filed, to serve upon the " owner of any real property so appropriated " a prescribed notice specifically describing " that portion of such real property belonging to such owner which has been so appropriated," and provides that " from the time of the service of such notice; the entry upon and the appropriation by the state of the real property therein described for the purposes of the work and improvement provided for by this act, shall be deemed complete." This act contains no other provision expressive of an intent of the legislature as to the interest or estate to be taken. The Canal Law (Laws of 1894, ch. 338) omitted the requirement of the revised and the

anterior statutes (Rev. Stat. part 1, ch. 9, title 9, art. 3, sects. 46, 48, 52; Laws of 1817, ch. 262, sec. 3) that the state should take the title in fee simple of the lands appropriated, and enacted, "The title to all real property permanently appropriated for the use of the canals of the state shall be vested in the people of the state." (Cons. Laws, ch. 5, § 83.) The term "real property" includes "real estate, lands, tenements and hereditaments, corporeal and incorporeal" (General Construction Law, sect. 40), or as defined in the Condemnation Law, "any right, interest or easement therein or appurtenances thereto" (Code of Civ. Pro. sect. 3358), and as used in section 4 of chapter 147 of the Laws of 1903 or sections 80 and 83 of the Canal Law is satisfied by the appropriation of an easement adequate for the use necessitating the taking. What we have just written is true likewise of the term "land" or "lands." (*People* v. *Fisher,* 190 N. Y. 468; *Newton* v. *City of Newton,* 188 Mass. 226; *Fish* v. *Fowlie,* 58 Cal. 373; *Brooklyn Park Com.* v. *Armstrong,* 45 N. Y. 234; *Whitman* v. *Town of Pownal,* 19 Vt. 223.) In the present case the state engineer and surveyor was authorized to determine not only the lands, structures and waters, but also the estate or interest therein required for the use of the improved canals.

The agreement on behalf of the state to convey to the relator the two lateral strips of land, each extending through and including a part of the canal prism, raises a serious question. If this is an agreement to convey the fee to the land within the blue lines of the canal with the consequent right of occupation it would undertake to create the opportunity or possibility of destroying the canal as a route of commerce, and would, therefore, violate the provision of the Constitution above referred to. The contract as an entirety plainly shows that such was not the agreement. The appropriation map with the certificate of the state engineer that the lands therein described are required for the use of the canals of the

state, and the plans of the bridge which the relator
agreed to erect and maintain to carry its tracks and
traffic over the canal are annexed to and by express
language made a part of the contract. The contract
recites " that the public use of said lands (appropriated)
for both railroad and canal purposes may be conserved
and adequately protected by the erection of a bridge car-
rying said railroad tracks over said canal." It recites:
"It is deemed advisable to adjust and settle any and all
damages which have been or may be caused" to the
relator by the appropriation of its lands "for the con-
struction and maintenance of said canal." The relator
agrees to construct the bridge "to carry their tracks and
traffic over the said canal." The plans for the bridge
portray the canal lands as wholly unobstructed, and the
lateral strips used upon either side of the canal lands,
and there only, as parts of the embankment or right of
way of relator necessarily widened at its base because of
its increased elevation. The contract in itself, its recitals
and its plans, clearly and with certainty discloses that
the contracting parties had in mind and intention that
the canal was to be constructed, maintained and operated
and was to be controlled, possessed and occupied by the
state, and that the railroad of the relator should be con-
structed across and over it and upon the lands as deline-
ated by the plans. That they intended or agreed that the
state should convey to the relator any interest or estate
in the lands of the canal which would enable or permit
the relator to own in fee, or control or occupy any part of
the lands within the prism or essential to the use or pur-
poses of the canal is unthinkable and contradictory of all
the other provisions and the entire spirit and expressed
purpose of the agreement. Viewing the specific agree-
ment to convey to the relator the strips of land from the
standpoint of the literal sense of its language, it works a
result unreasonable and destructive of the very purpose
contemplated in the contract and from which it sprung,

and an obscurity of meaning evoking an attempt to ascertain, through interpretation, a meaning and understanding of the parties reasonable and executable. (*Knower* v. *Emerson*, 9 Pick. 422.)  We must look to the contract as a whole, to the subject with which it deals, to the circumstances under which it was made and thereby determine the true intent and purpose of the parties, and if such intent and purpose is reasonably within the scope of the language used it must be taken to be a part of the contract the same as if it were plainly expressed.  Indeterminate forms of expression inconsistent with the evident design of a contract are to be understood in a sense subservient to the general purposes of the contract.  The generality of the words used should be restrained by the particular occasion.  "All words," says Lord Bacon, "whether they be in deeds, or statutes, or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter and the person." (Bacon's Law Maxims, reg. 10.)  Words should not be taken in their broadest import when they are equally appropriate in a sense limited to the object the parties had in view.  The ascertainment of the substantial intent of the parties is the fundamental rule in the construction of all agreements. (*Canal Co.* v. *Hill*, 15 Wall. 94.) An agreement will not be adjudged to be illegal where it is capable of a construction which will make it valid. (*Lorillard* v. *Clyde*, 86 N. Y. 384, 387; *Hobbs* v. *McLean*, 117 U. S. 567.)

We are to assume that the parties made the contract in good faith and for the praiseworthy object expressed, of avoiding litigation, and we must construe their language, if practicable, with a view to this object, and in the light of such existing facts as the parties are presumed to have known. (*Woodruff* v. *Woodruff*, 52 N. Y. 53.)  The contracting parties clearly had in view a definite result, namely, the fixing of the sum the state should pay the relator as its damages, and, as necessary elements in

reaching those damages, that the right of way of the
relator should be re-established and under a completed
and definite method and plan.  Obviously the damages
of the relator could not be estimated unless and until
those facts existed.  By the mutually accepted plans the
state had, prior to July 27, 1911, through its officers duly
empowered, subjected the appropriated lands and the
strips of land to easements vested in the relator.  The
relator had accepted those easements as adequate for the
use of its railroad.  The term " land " or " strip of land "
has, as we have stated, an indeterminate or general, and
not a rigid or single meaning, and under the rules of con-
struction and the circumstances above stated it seems
clear that the parties intended and agreed to confirm, as
the basis for fixing the damages, the state of things as
existing at the time the contract was made, and that the
state should convey to the relator the easement only in
those strips of land as the plans required.  The state did
not agree to convey them in fee simple, and, therefore,
the Constitution does not nullify the agreement.

We hold, therefore, that the People of the state were
not forbidden by the Constitution to make the contract.
Whether or not they had by legislative enactment empow-
ered the special examiner and appraiser, the superintend-
ent of public works and the canal board to make it in their
behalf remains to be considered.  The special examiner
and appraiser had the power to fix and determine with an
owner of appropriated real property upon a fair valuation
of it, or the damage resulting to the owner, and to agree
upon a price to be paid therefor by the state and accepted
by the owner in full compensation for such real prop-
erty, " or for the damage caused by said work or improve-
ment."  The agreement of the special examiner " shall
be reduced to writing and signed " by the parties, and
submitted by him " to the superintendent of public works
who, if he shall approve, shall submit said agreement to
the canal board with his recommendations, for approval."

" If in the opinion of the canal board, it is possible by means of such appraisal and agreement, to acquire for the state a good title to the entire interest of any specific parcel of land or other property or right necessary for said improvement within the survey made by the state engineer and surveyor and certified by him, pursuant to section four of chapter one hundred and forty-seven of the laws of nineteen hundred and three, and acts amendatory thereof, and that it will be for the advantage of the state to obtain such specific property or right without condemnation proceedings or resort by said owners to the court of claims, said canal board shall approve such agreement so entered into with such owners, and upon the presentation and delivery of proper conveyances, duly approved by the attorney-general, said canal board may certify its acceptance thereof to the comptroller for payment under the provisions of section thirteen of chapter one hundred and forty-seven of the laws of nineteen hundred and three, and acts amendatory thereof, to the owner or owners severally named therein." (Laws of 1908, ch. 195, as amended by Laws of 1910, ch. 334.) Apart from the restrictions imposed by the Constitution, the legislature is as free as is the individual to give authority to compromise or adjust unliquidated liabilities or adverse demands and avoid thereby litigation. The legislative act providing for the appointment of the special examiner and appraiser and defining his powers is such an authority and should be given such scope and liberality fitted to its purpose as a fair and reasonable construction may yield. All the stipulations of the agreement of July 27, 1911, are related to the basis for estimating the damages or to their sum. The agreement was inchoate until approved by the superintendent of public works and the canal board to whom are committed by the legislature comprehensive powers of control and management of the canals. The provisions of the agreement are consistent with and within those powers and we perceive therein no use or

People ex rel. N. Y. C., etc., R. R. Co. *v.* Walsh.    103

1914.]                    Opinion, per Collin, J.                    [211 N. Y.]

exercise of the legislative act hazardous or harmful to the state. It would not be advantageous to the state or a wise or intelligent construction of the act to hold that the damages of the relator may not, by agreement, be reduced or prevented or settled in part by lawful acts of the state beneficial to the relator.

The defendants urge that certain of the sums to be paid as damages and entering into the aggregate sum of $352,993.50 should not have been included. The purposes for which the sums objected to were allowed were lawful bases for damages. The relator was entitled to be paid the damages resulting or accruing to it in consequence of the appropriation of its land, after deducting therefrom the benefits received by or resulting to it in consequence of the construction and maintenance of the canal. (Canal Law, sec. 83.) It is not claimed that the sum of the damages as fixed by the agreement is affected by fraud, collusion or bad faith. We are not at liberty to review, even were we so inclined, the fairness or unfairness of the sum. Such review would involve intricate questions of fact, but no question of law.

We have not overlooked any of the arguments or assertions in the brief of the learned attorney-general. While we do not find in the agreement any provision or stipulation invalidating it, we think the Special Term order and the writ issued should be modified by striking from them the parts commanding the defendant Milliman, special examiner and appraiser, to execute or procure the execution of and cause to be delivered to the relator the quitclaim deeds as described in them. The provision of section 35 of the Canal Law and section 13 of the Railroad Law that the superintendent of public works shall have a general supervisory power over so much of any railroad as passes over any canal or feeder belonging to the state, so far as may be necessary to preserve the free and perfect use of such canal or feeders, or for making any repairs, improvements or alterations thereupon

applies to the present crossing of the canal by the railroad of relator. The relator has its power to construct its railroad across the canal, not from the fact of the appropriation of its right of way by the state, but from the provision of the Railroad Law (Laws of 1890, ch. 565, sect. 4, subdivision 4) giving it power to construct its road across any of the canals of the state. The statutes contemplate that the manner and method of the crossing shall be supervised and acquiesced in, at least, by the superintendent of public works. While the relator had the right to construct its railroad across the canal, the superintendent of public works had the right and was under the duty to participate in the manner and method of crossing. He was not absolved, by the fact that the railroad preceded the canal, from the care, management and control of the canal committed to him by the statutes. The statutes devolved upon him the power and duty, subject to the prescribed restrictions, to give the consents, licenses or easements, oral or written, suitable to the crossing determined upon. Under the statutes and the agreement approved by him and the canal board, he was under the legal duty to execute and deliver to the relator for and on behalf of the state the quitclaim deeds promised by the contract.

The order of the Appellate Division should be reversed and the order of the Special Term and the writ issued pursuant thereto modified as above indicated, and as so modified affirmed, without costs to either party.

HOGAN, J. (dissenting). November 16th, 1909, the state engineer, pursuant to the provisions of chapter 147 of the Laws of 1903, entered upon certain land of the relator, and took possession of the same for the purposes of the improved Erie canal; a map of said premises was made by him and filed in his office and a duplicate thereof, duly certified, filed in the office of the superintendent of public works, who thereupon served on relator the notice

required by the statute and complied with the remaining
provisions of the law.    Immediately the appropriation of
the land of relator, described by metes and bounds, was
complete, and the notice served was made conclusive evi-
dence of the entire appropriation and quantity of land
appropriated.    The map so filed was evidence of title to
the land appropriated in the state. (*Carpenter* v. *City of
Cohoes,* 81 N. Y. 21.) The right of relator to recover
compensation for the land so appropriated was recognized
in the law of 1903, and the remedy prescribed for secur-
ing such compensation was by a hearing before the Court
of Claims.    The statute of 1903, as well as the General
Canal Law of the state, contemplated and provided for
the taking by the state of a fee title to the premises
described in the notice and certified map.

In the construction of the canal the legislature has
recognized and provided for " permanent " appropriation
of lands for canal purposes, as contradistinguished from
a " temporary " appropriation also provided for by stat-
ute, and provisions exist for the acquisition of water for
the canals by a limited appropriation, but so far as I
have been able to determine the proposition that the
state by a permanent appropriation of land for canal pur-
poses, and especially for the prism of the canal, obtains
less than a title in fee simple to real property so appro-
priated, or that the appropriation by its terms is lim-
ited, has never been asserted.

The state having acquired a fee simple title to the land
appropriated, the land could not be sold or disposed of,
save after the abandonment of the same under the statute
and as recognized under the law of 1903.

While it is true that a railroad company may construct
its tracks across the canals under proper regulations
imposed by the superintendent of public works, such per-
mission, however, does not operate as a grant or ease-
ment to a railroad company of any interest in the prism
of the canal.

As to the power of the special examiner and appraiser, his authority was limited to an agreement with the relator as to the value of the real property which had been appropriated and damages incident to such appropriation. He was an officer with limited powers defined in the statute, the terms of which the relator was bound to have knowledge of. As pointed out by Justice WOODWARD, who wrote in the Appellate Division, and in whose opinion generally I concur, that officer exceeded the authority conferred upon him, and subsequent action by the canal board seeking to ratify his act would not bind the state. The legislature did not confer upon him authority to dispose of canal lands and barter away the money and property of the state at his will. To justify the attempted bargain made by him with relator would enable such officer to exercise control of the lands and funds of the state without limitation, if his action should thereafter be approved by the canal board.

With reference to the lands contracted to be conveyed to relator, outside the prism of the canal, evidently for the purposes of its railroad, the record does not disclose ownership by the state of such strips of land about one-quarter of a mile in length on the northerly and southerly sides of the roadbed of relator. I do not think that we are justified in assuming that the state owns such lands. If, however, we shall assume ownership by the state of such lands, we must also presume that the state is the owner of such lands for canal purposes, which before any sale or conveyance of the same is made must be abandoned for canal purposes. If the land is not owned by the state, it cannot be acquired by the state for the purpose of conveying the same to the relator for railroad purposes under the guise of condemnation for the purposes of the canal.

The record also discloses action by the canal board repudiating certain provisions of the contract which, if valid, would operate as a breach or rescission of the contract on the part of the state.

This proceeding is in effect an action for specific performance of a contract and, in my opinion, mandamus is not the proper remedy in such a case.

WERNER, HISCOCK, CHASE and MILLER, JJ., concur with COLLIN, J.; WILLARD BARTLETT, Ch. J., concurs in result; HOGAN, J., reads dissenting opinion.

Ordered accordingly.