In the Matter of the Arbitration between WESTERN UNION TELE-
GRAPH COMPANY, Respondent, and AMERICAN COMMUNICATIONS
ASSOCIATION, C.I.O., Appellant.

In the Matter of the Application of WESTERN UNION TELEGRAPH
COMPANY, Respondent, to Vacate an Award of Arbitration.
AMERICAN COMMUNICATIONS ASSOCIATION, C.I.O., Appellant.

Argued February 24, 1949; decided April 20, 1949.

*Victor Rabinowitz, Belle Seligman* and *Robert B. Seidman* for appellant. I. The arbitrator did not exceed the powers conferred upon him. (*Matter of Smith,* 254 N. Y. 283; *Mesibov, Glinert & Levy* v. *Cohen Bros. Mfg. Co.,* 245 N. Y. 305; *Horby Realty Corp.* v. *Yarmouth Land Corp.,* 270 App. Div. 696; *Matter of Pine St. Realty Co.* v. *Coutroulos,* 233 App. Div. 404, 258 N. Y. 609.) II. The award may not be vacated on the ground that it sanctions violations of the Penal Law. (*National Labor Relations Bd.* v. *Mackay Radio & Tel. Co.,* 304 U. S. 333; *Church of Holy Trinity* v. *United States,* 143 U. S. 457; *United States* v. *Kirby,* 7 Wall. [U. S.] 482; *United States* v. *Katz,* 271 U. S. 354; *Woollcott* v. *Shubert,* 217 N. Y. 212; *Wass* v. *Stephens,* 128 N. Y. 123; *Commonwealth* v. *Hunt,* 45 Mass. 111; *Bossert* v. *Dhuy,* 221 N. Y. 342; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459; *Exchange Bakery & Restaurant* v. *Rifkin,* 245 N. Y. 260; *Goldfinger* v. *Feintuch,* 276 N. Y. 281.)

*John H. Waters* and *William E. Seward* for respondent. I. The arbitrator's award was properly vacated, for it expressly gave sanction to the commission of acts contrary to public policy and made criminal by provisions of the Penal Law. (Penal Law, §§ 552, 1423; *Matter of Gale* v. *Hilts,* 176 Misc. 277; *People* v. *O'Brien,* 111 N. Y. 1; *Wass* v. *Stephens,* 128 N. Y. 123; *People ex rel. Western Union Tel. Co.* v. *Public Service Comm.,* 230 N. Y. 95; *National Labor Relations Bd.* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240; *C. G. Conn, Ltd.,* v. *National Labor Relations Bd.,* 108 F. 2d 390.) II. The arbitrator's award was properly vacated for the arbitrator plainly exceeded the powers granted to him in the contract. (*Town of Putnam Valley* v. *Slutzky,* 283 N. Y. 334.)

LEWIS, J. Our inquiry upon this appeal goes to the legal sufficiency of an award made by an arbitrator named in a collective bargaining agreement between the appellant, American Communications Association, C.I.O.— to which reference will be made as the union — and the respondent, Western Union Telegraph Company.

At Special Term — where an application by the union for confirmation of the award was met by a cross motion by Western Union for vacatur — the award was confirmed and vacatur denied. Upon appeal by Western Union the Appellate

Division by a divided court reversed the order of confirmation " upon the law, the questions of fact not having been considered ". The present appeal by the union is taken as of right.

Since its merger in 1943 with the Postal Telegraph Cable Company* Western Union has been the only landlines telegraph carrier operating in the United States. As a separate enterprise Western Union operates a cable division which is one of several competing international telegraph and radio carriers. In the operation of that single landlines system, and to insure a fair distribution of cable traffic among the several competing carriers handling international messages, Western Union is required by the Federal Communications Act to accept all outbound international communications offered to it by the public and to transmit the same in accord with a formula and regulations prescribed by the Federal Communications Commission. When such cable messages are received at Western Union offices on its vast web of lines within the United States the landlines division transmits them to its international distribution office in New York City where all outbound cablegrams are distributed to the international carriers in accord with quotas prescribed by the Federal Communications Commission. As to inbound cable messages which have their origin in foreign countries, each message is transmitted to the United States on the cable facilities of the international carrier with which it originates — including those facilities operated by Western Union's cable division. When such an inbound cable message reaches this country it is taken over by Western Union's landlines division for transmission to the addressee and is handled as a domestic telegram. It thus comes about that Western Union's landlines division acts as a connecting carrier — within the United States — for its own separate cable division and for all other competing international carriers according to rates, routing and regulations promulgated by the Federal Communications Commission under the Federal Communications Act. By that act (U. S. Code, tit. 47, § 201) Western Union is required — " to furnish such communication service upon reasonable request therefor " (subd. [a]). In payment for its service as a connecting carrier Western

---

* Federal Communications Act of 1934; U. S. Code, tit. 47, § 222.

Union landlines division collects from its separate cable division and from competing international carriers according to tariffs established by the Federal Communications Commission and may not accord preferential treatment of any kind to any international carrier.

Important to our inquiry is the fact that the 7,000 employees of Western Union's landlines division within the metropolitan area of New York have as their agent in matters relating to collective bargaining the appellant union's Local No. 40. The employees of Western Union's cable division — approximately 350 in number — are represented by the appellant union's Local No. 11.

On June 18, 1947, Western Union entered into a collective bargaining agreement with the appellant union covering employees who are members of that union's Local No. 40. Included in that agreement was the following provision: "SECTION 31. Since *the Company's business is one of serving the public* and *it is the mutual desire to both the Company and the Union to provide uninterrupted and continuous public service,* to promote industrial peace and to provide for stable labor relations, the Company agrees that there shall be no lockouts and *the Union agrees that there shall be no strikes or other stoppages of work during the life of this contract* " (emphasis supplied).

On January 2, 1948 — contemporaneously with other locals affiliated with the appellant union and representing employees of competing international cable companies — Local No. 11 called a strike of employees in Western Union's cable division which strike prevailed until March 31, 1948. At a " special membership meeting " held January 3, 1948, the day following the onset of the strike called by Local No. 11 and other locals, Local No. 40 — *which was not on strike* and which, as we have seen, comprised *landlines* employees of Western Union in the metropolitan area of New York — passed unanimously a formal resolution which provided in part " we will take every action necessary to force the Mackay Radio, Commercial Cable, All America, and the Western Union Cable Companies to bargain in good faith with Locals 10, 11, and 15. *To accomplish*

*this purpose we will not handle struck traffic*"* (emphasis supplied).

Although Local No. 40 did not strike, a substantial number of its members — employees of Western Union's landlines division — complied with the resolution quoted in part above and refused to handle " hot traffic ", viz., cable messages which . had been transmitted by or were destined for any of the international companies in which strikes prevailed. The refusal to handle " hot traffic "— concededly practiced by such employees — interrupted and delayed the forwarding of messages which Western Union was required by law to transmit, disarranged a system of work designed by Western Union to assure the quick dispatch of those messages, and made idle those employees who, although trained in the technique of such work, refused to transmit messages which were within their prescribed duties in the performance of an ordinary day's work. The arbitrator found that " On January 9th the Company began advising employees who were refusing to handle ' hot traffic ' that they would be suspended for four months if they did not perform all of their customary duties. Warnings which were ignored were followed by suspensions. On January 23rd the Union requested the instant arbitration and hearings were held on January 26th and 27th."

By the award made following those hearings it was determined that section 31 of the collective bargaining agreement (quoted *supra*, p. 181), when read in the light of a " custom of trade " which the arbitrator found existed, viz., the refusal by nonstriking employees in the telegraph industry to handle " hot traffic ", did not prohibit the union from directing employees not to handle such traffic or the employees from following such directions. The award also directed Western Union to submit to the union for future action by the arbitrator a list of employees whom the company claimed had hidden or mutilated cablegrams which had come into their hands and whose suspension it claimed was justified by such misconduct. The company was further directed to reinstate, with back pay, all

---

* The record indicates that " struck traffic " and " hot traffic " are synonymous phrases used by telegraph operators when referring to cablegrams or telegrams which, at some point in their transmission, have been handled by a company where a strike prevails.

suspended employees whose names did not appear on such list. The award also provided — " It is possible that some employees, because of their unwillingness to handle struck traffic, may not be occupied full time. If the Company [Western Union] sees fit, it may make a proportionate deduction from the salary of any such employee."

Against this background we are to determine as a matter of law whether, as held by the Justice at Special Term, it was " within [the arbitrator's] power to construe and interpret the [collective bargaining] contract in the light of its language and the background of the industry in which the agreement was operating ", or, as ruled by the Appellate Division, the award herein — " must be set aside on the ground that the arbitrator exceeded the powers conferred upon him, and, on the further ground that the controversy submitted to arbitration involved the right of telegraph employees to conduct themselves in a manner expressly forbidden by statute." (274 App. Div. 754.)

We agree with the bases upon which rests the decision of the Appellate Division. The collective bargaining contract under which the arbitrator acted contains the following provision: " SECTION 6. (a) In the event that an agreement cannot be reached between the Union and the Company with respect to the application or interpretation of this contract, or with respect to any grievances as defined in Section 5(h), it is agreed that such matters shall be submitted on the request of either party to Max Meyer, as impartial arbitrator * * *. *The arbitrator shall not have the authority to alter or modify any of the express provisions of the contract,* nor shall he have the power to make a ruling contrary to any agreement reached by the parties in the course of negotiations for this contract " (emphasis supplied).

In view of the clearly expressed agreement by the parties that in the event of their disagreement with respect to the interpretation of their contract an arbitrator shall have no authority to modify its express provisions, and in view of the express provision in section 31 of the contract that " there shall be no strikes or other stoppages of work during the life of this contract ", the award before us, as we view it, amply demonstrates that the arbitrator exceeded the power granted to him (Civ. Prac. Act, § 1462, subd. 4).

Where, as in the contract which the arbitrator was here called upon to interpret, '' the language is unambiguous, the words plain and clear, conveying a distinct idea, there is no occasion to resort to other means of interpretation. Effect must be given to the intent as indicated by the language employed '' (*Settle* v. *Van Evrea,* 49 N. Y. 280, 281). Upon that subject this court has said that '' Evidence of custom is permitted for the purpose of qualifying the meaning of a contract *where otherwise ambiguous* and of providing for incidents not in contradiction of the fundamental provisions of the contract and of supplying omissions under certain circumstances which have occurred in the agreement of the parties. Evidence of it is not permitted for the purpose of contradicting the agreements which the parties have made or for the purpose of accomplishing an unfair or immoral construction of their contract '' (emphasis supplied). (*Gravenhorst* v. *Zimmerman,* 236 N. Y. 22, 33–34, and see *Gearns* v. *Commercial Cable Co.,* 293 N. Y. 105, 109; *Green* v. *Wachs,* 254 N. Y. 437, 440–441.) That no provision in section 31 of the contract impressed the arbitrator as ambiguous is indicated by his statement — '' If we were to construe that language in vacuo we might well find that the Union's direction to the employees not to handle ' hot traffic' violated the letter if not the spirit of the clause.'' Although the record is clear that '' stoppages of work '' did result from refusal by employees of Western Union's land-lines division to handle '' hot traffic '', the arbitrator found that such refusal conformed to a practice generally prevalent in the telegraph industry. Thereupon, despite his own disclaimer of ambiguity in the contract, he concluded that '' the language of Section 31 must be read in the light of this practice and that so read it does not prohibit the Union from directing employees not to handle ' hot traffic ' or the employees from following such directions.''

By that conclusion, as we view it, the arbitrator — entering a field of decision from which the parties had expressly excluded him — modified an express provision of the contract by which the union had agreed that '' there shall be no  *  *  *  stoppages of work during the life of this contract.'' As the language employed to express the union's agreement leaves no doubt as to its meaning '' there is no occasion to resort to other means of

interpretation " (*Settle* v. *Van Evrea, supra,* p. 281; and see *Brainard* v. *New York Central R. R. Co.,* 242 N. Y. 125, 133).

We know of no case where a court, in construing a contractual obligation expressed in language as clear as is the clause here in controversy, has found it necessary to employ extrinsic means to ascertain a party's obligation thereunder. The lack of such authority may well be due to the early rule in *Collender* v. *Dinsmore* (55 N. Y. 200, 208–209): "Custom and usage is resorted to only to ascertain and explain the meaning and intention of the parties to a contract when the same could not be ascertained without extrinsic evidence, but never to contravene the express stipulations; and if there is no uncertainty as to the terms of a contract, usage cannot be proved to contradict or qualify its provisions. * * * Usage is sometimes admissible to add to or explain, but never to vary or contradict, either expressly or by implication, the terms of a written instrument, or the fair and legal import of a contract."

The modification of the contract here accomplished, being, as we believe, in excess of the arbitrator's authority as limited by the parties, serves to vitiate the award (Civ. Prac. Act, § 1462, subd. 4).

We come then to the effect which certain provisions of the Penal Law have upon section 31 of the contract *as interpretated by the arbitrator and by Special Term.*

On this branch of the case we note at the outset the statement by Dean Wesley A. Sturges, in his text "Commercial Arbitrations and Awards" at page 202 (§ 61): "It may be stated generally that controverted claims which are not enforceable for illegality cannot be submitted to arbitration either at common law or under an arbitration statute." (See, also, 6 C. J. S., Arbitration and Award, § 12; 3 Am. Jur., Arbitration and Award, § 11.)

By section 552 of the Penal Law it is provided:

" A person who: * * *

" 2. *Being such clerk, operator, messenger or other employee,* wilfully divulges to anyone but the persons for whom it was intended, the contents or the nature thereof of a telegraphic or telephonic message or dispatch intrusted to him for the transmission or delivery, or of which contents he may in any manner become possessed, or *occupying such position in a telegraph office*

*shall wilfully refuse or neglect duly to transmit or deliver mes-sages received at such office* * * * is punishable by a fine of not more than one thousand dollars or by imprisonment for not more than two years, or by both such fine and imprisonment " (emphasis supplied).

A further penal provision is found in section 1423 of the Penal Law:

" A person who wilfully or maliciously displaces, removes, injures, or destroys: * * *

" 6. A line of telegraph or telephone * * * or who *shall wilfully prevent, obstruct or delay,* by any means or contrivance whatsoever, the sending, transmission, conveyance or delivery, in this state of any authorized message, communication or report by or through any telegraph or telephone line, wire or cable, under the control of any telegraph or telephone company doing business in this state; or who *shall aid, agree with, employ or conspire with any person or persons to unlawfully do, or permit or cause to be done, any of the acts hereinbefore mentioned* * * *.

" 9. * * * is punishable by imprisonment for not more than two years " (emphasis supplied).

No one has suggested that the collective bargaining agreement with which we are concerned is illegal as drawn. However, if, as the award before us and the decision by Special Term would indicate, we are warranted as a matter of law in reading section 31 of that contract in the light of a " practice of the trade " which permits a telegraph employee, without leaving his job, to refuse to forward a telegram or cablegram which comes to his hand in the ordinary course of business, then judicial sanction will be given to such conduct by an employee who " occupying such position in a telegraph office shall wilfully refuse or neglect duly to transmit or deliver messages received at such office ". That, however, is precisely the act which the Legislature by section 552 of the Penal Law (*supra*) has declared to be a crime and has made punishable by fine or imprisonment or both.

Likewise if we are to read section 31 of the contract in accord with the award herein and the decision by Special Term — which would permit a telegraph employee while remaining on his job in good standing to refuse to transmit a telegram or cablegram — then judicial sanction will be given to the acts of any such

employee who " shall wilfully prevent, obstruct or delay, by any means or contrivance whatsoever, the sending, transmission, conveyance or delivery, in this state of any authorized message * * * or who shall aid, agree with, employ or conspire with any person or persons to unlawfully do, or permit or cause to be done, any of the acts hereinbefore mentioned ". That, however, is precisely the conduct which the Legislature by section 1423 of the Penal Law (*supra*) has declared to be a crime, punishable by imprisonment for not more than two years.

The penal statutes quoted above do not deprive an employee of his right to leave his position and to engage in a strike. Nor can it be said, as suggested by counsel for the union, that those statutes are intended to apply only to employees who have tampered with telegraphic messages for personal gain. The manifest purpose of the Legislature was to preserve for public use the service which a telegraph company is required to furnish (see Federal Communications Act of 1934, § 201, subd. [a]; § 202, subd. [a]; U. S. Code, tit. 47, §§ 201, 202; Transportation Corporations Law, § 28; Public Service Law, § 91, subd. 3; cf. *People ex rel. Western Union Tel. Co.* v. *Public Service Comm.*, 230 N. Y. 95, 100–101). To that end and in line with established public policy the Legislature chose penal measures as means to avoid disruption of the *public service* furnished by a telegraph company.

Obviously the function which Western Union's landlines division is required by law to perform as the sole connecting carrier for the several international cable companies, is a service affected by a public interest. In that connection the fact is again noted that by section 31 of the collective bargaining agreement here invoked (quoted *supra,* p. 181), the parties thereto expressly agreed that " the Company's business is one of *serving the public* and *it is the mutual desire to both the Company and the Union to provide uninterrupted and continuous public service* " (emphasis supplied). From those circumstances it follows that any construction of the terms of the contract in suit which tends to restrict the free and general use of telegraph lines and the public service those facilities afford is invalid (*Central New York Tel. & Tel. Co.* v. *Averill,* 199 N. Y. 128, 134, 135; and see Public Service Law, art. 5).

It is difficult to understand how Western Union can discharge those duties required of it by both Federal and State statutes if it is also required to *retain* in its service employees whose duty it is to transmit telegraph messages but who refuse to handle messages offered by the public which happen to be routed over facilities of a telegraph company where a strike prevails. To approve such a practice would to that extent oust the employer company from control of its own business and to that extent would prevent it from performing duties to the public required by law.

The award herein as confirmed by Special Term approves of action taken by the appellant union's Local No. 40 pursuant to its resolution adopted January 3, 1948. We are not disposed to approve that award which would permit Western Union's land-lines employees, *while still occupying positions in that company's offices,* to determine — for reasons of their own and contrary to the company's demand upon them for the maintenance of standard service — that messages routed to and from certain cable companies should not be transmitted. " The law will not presume an agreement void as illegal or against public policy when it is capable of a construction which would make it consistent with the laws and valid " (*Curtis* v. *Gokey,* 68 N. Y. 300, 304; *Bigelow* v. *Benedict,* 70 N. Y. 202, 204–205; *Lorillard* v. *Clyde,* 86 N. Y. 384, 387; *Shedlinsky* v. *Budweiser Brewing Co.,* 163 N. Y. 437, 439; *People ex rel. New York Central & Hudson Riv. R. R. Co.* v. *Walsh,* 211 N. Y. 90, 100; *Hobbs* v. *McLean,* 117 U. S. 567, 576).

The order should be affirmed, with costs.

DESMOND, J. (dissenting). These parties agreed (§ 6, subd. [a]) to send to the named arbitrator for determination, all disputes " with respect to the application or interpretation of this contract ". A dispute arose between them as to the application or meaning of so much of section 31 of the agreement as provided that " there shall be no strikes or other stoppages of work during the life of this contract." The union, in connection with a strike called by another union, had refused to handle " struck traffic ". The arbitrator, after hearings, held that, in view of the tradition and customs of the industry, which he felt he could not ignore and in the light of which the language " stop-

pages of work '' had to be construed, the phrase did not prohibit employees refusing to handle '' hot '' or '' struck '' messages. That was a pure question of interpretation and application, and the very kind of question which the parties themselves had agreed should be decided by the arbitrator alone. Accordingly, his decision must stand (*Matter of Wenger & Co.* v. *Propper Silk Hosiery Mills,* 239 N. Y. 199, 202). Whether we consider that decision to be ''right '' or '' wrong '' is beside the point. '' The courts in this State have adhered with great steadiness to the general rule that awards will not be opened for errors of law or fact on the part of the arbitrator.'' (*Fudickar* v. *Guardian Mut. Life Ins. Co.,* 62 N. Y. 392, 400.) '' The conclusiveness of awards is based upon the principle that the parties having chosen judges of their own and agreed to abide by their decision, they are bound by their agreement and compelled to perform the award.'' (*Matter of Wilkins,* 169 N. Y. 494, 496, 499; see *Matter of Marchant* v. *Mead-Morrison Mfg. Co.,* 252 N. Y. 284, 300, 302; *Matter of Morris White Fashions* (*Susquehanna Mills*), 295 N. Y. 450, 456.) '' It is the duty of the court to enforce their agreement rather than to undertake itself to settle the dispute or to narrow the field of arbitral disputes.'' (*Matter of Wenger & Co.* v. *Propper Silk Hosiery Mills, supra,* p. 202.)

The second ground asserted for vacating the award is that it would, we are told, condone or legalize violations of sections 552 and 1423 of the Penal Law, which make it criminal for telegraph employees willfully to refuse or neglect to transmit or deliver messages, or willfully to prevent, obstruct or delay such transmission or delivery. To refuse confirmation on this ground is to hold, as matter of law, that any refusal by a telegraph company employee, for any reason whatever, to handle a message, is a crime, even though the message is forthwith handled by another employee, after the first employee's refusal. I think that goes much too far. No decision anywhere upholds it.

If the arbitrator was within his powers in holding, as to the first point, that the employees' refusal to handle the struck traffic was within the rights of their employment, then, of course, it could not possibly be that their action was *criminal* as matter of law.

The order of the Appellate Division should be reversed and the order of Special Term affirmed, with costs in this court and in the Appellate Division.

CONWAY, DYE and BROMLEY, JJ., concur with LEWIS, J.; DESMOND, J., dissents in opinion in which LOUGHRAN, Ch. J., and FULD, J., concur.

Order affirmed.