■ GATEWAY TOWERS, INC., et al., Appellants-Respondents, v TISHMAN REALTY & CONSTRUCTION CO., INC., Respondent-Appellant.—Order, Supreme Court, New York County, entered September 6, 1974, denying plaintiffs' motion and the defendant's cross motion for summary judgment, modified, on the law, to grant plaintiffs' motion to the extent of declaring their

entitlement to the tax refunds, with interest thereon, for the years 1968 through 1972, and to grant the defendant's motion to the extent of declaring its entitlement to the refunds for the years 1966 and 1967 unencumbered by any claims for rent credits and counsel fees, and otherwise affirmed, without costs and without disbursements. The defendant, operating through a wholly-owned subsidiary, constructed a residential-office building on land it had leased in Pittsburgh. The building was completed in 1967 and sold in the same year to the plaintiffs trustees of an employees' profit sharing plan. To meet the needs of the parties, the transaction was fashioned to sell all of the subsidiary's stock to the trust which would then make successive transfers to repose ultimately the ownership of both the lease and the building in the name of the corporate plaintiff who would succeed to the interest of the subsidiary which would then be dissolved. The purchase agreement was dated December 28, 1967. Prior to that time, the subsidiary whose stock was being sold had appealed the assessed valuation of the property for the triennial 1966–1968 and had filed for tax refunds in 1966 and 1967. In the agreement the defendant reserved the right to receive any taxes refunded for the period ending December 31, 1967. After the agreement, the plaintiffs filed for a refund of the 1968 taxes and protested the following triennial assessment, 1969–1971, as well as the tax payment for 1972. Another feature of the agreement, designed to provide the trust with a 6% annual return on its investment of $2,000,000, called for the defendant to guarantee a net cash flow of $120,000 in each of the years 1968, 1969 and 1970 and of $1 in 1971, this to be computed according to generally accepted accounting methods. Under the agreement the defendant was to manage the building during the period of the guarantee, keep the books and render monthly statements. The plaintiffs would then have annual statements of the net cash flow prepared and delivered to the defendant upon whom they would become binding and conclusive unless the defendant objected within a certain defined period. A note given by the plaintiff trustees to the defendant required that 50% of any initial cash flow, annually, in excess of $180,000 would be applied first to prepaid interest until it aggregated $1,800,000 and the remainder to principal. Under the cash flow guarantee, the defendant paid the plaintiffs $240,727 for 1968, $120,213 for 1969, $58,108 for 1970 and $55,328.77 for 1971. In November, 1972 a check was issued for tax refunds for the years 1966 through 1971 and a check for the year 1972 was issued in 1973. Because there was a controversy between the parties over these refunds, they have been placed in a joint account awaiting court resolution, the only draw against them having been for attorneys' fees incurred in obtaining the refunds. Our modification effectuates the intention of the parties as it was clearly expressed in their detailed contract to which each gave an informal consent. With the contract unambiguous, its language is controlling *(Matter of Western Union Tel. Co. [American Communications Assns.]*, 299 NY 177). "The court must construe the agreement as made and may not make a new agreement by construction" *(Sandberg v Reilly*, 223 App Div 57, 59). It is conceded that the plaintiffs are entitled to the 1972 refund and that the defendant is entitled to the refunds for 1966 and 1967. Nowhere in the agreement have the plaintiffs reserved the right to diminish the 1966 and 1967 refunds by any amounts that they must rebate to subtenants because of the tax refunds. Nor is there any reference in the agreement to attorneys' fees to be charged against the refunds for those years. While reserving to itself the 1966 and 1967 refunds, nowhere has the defendant extended this reservation to any refunds for 1968 through 1971 and accordingly these must be deemed to have remained

assets of the subsidiary whose stock was sold to the plaintiffs. The defendant's allegation that the plaintiffs would receive an uncontemplated windfall were they to receive the refunds for those years in which the defendant had to pay on its guarantee is unsupported by evidence. The proof is that the plaintiffs were aware that the tax refunds would not be taken into account in the guarantee years unless they were actually received then. The plaintiffs were also aware that if and when the refunds were received, it would be likely that the defendant would benefit because they would have a substantial effect upon the plaintiffs' liability for prepaid interest. It may be inferred that the defendant was similarly aware since it specifically reserved the refunds for 1966 and 1967 and did not seek to reserve those for the guarantee years. This was a logical action since the stock of the subsidiary that owned all of the refunds was held by the defendant in 1966 and 1967 and by the plaintiffs thereafter. Whether or not accepted accounting principles would require amortization of the tax refunds (but, see, 1 American Institute of Certified Public Accountants, Accounting Principles, § 5514.03, p 4016, as authority for the exclusion of contingent assets), the annual cash flow statements had their genesis in figures supplied by the defendant who was aware of the pendent tax claims. Its acceptance of the statements without objection is conclusive *(Sea Modes v Cohen,* 309 NY 1). The defendant has provided no evidence that would support a claim for reformation for either fraud or mutual mistake. Concur—Stevens, P. J., Lane, Nunez and Lynch, JJ.; Murphy, J., dissents in a dissenting memorandum, as follows: Murphy, J. (dissenting). I disagree since, in my view, simple justice mandates summary judgment for defendant. Pursuant to the terms of the leasehold purchase and sale agreement defendant guaranteed plaintiffs a 6% return on their cash investment ("net cash flow"), or $120,000 a year. The guarantee was for the years 1968, 1969 and 1970. For the year 1971 defendant guaranteed plaintiffs, in effect, against any losses. In fulfillment of said guarantee, defendant paid plaintiffs a total sum in excess of $474,-000. At the time of the sale on December 27, 1967, a protest (filed by defendant's subsidiary) was pending against the triennial assessment for the years 1966, 1967 and 1968. After the sale, plaintiffs caused a protest to be filed against the next succeeding triennial assessment. The agreement reserves to defendant the right to control and receive tax refunds for years prior to December 31, 1967; but is silent with respect to refunds attributable to subsequent years. In October, 1972, these tax proceedings were concluded by a determination reducing the assessments for each of the years 1966 through 1971, resulting in tax refunds in the aggregate principal amount of $338,418.17; of which $107,698.04 relates to 1966 and 1967 and the balance, $230,720.13, is applicable to 1968–1971, inclusive. In 1973, a tax refund of $57,506, plus interest, was paid with respect to 1972 taxes. Plaintiffs concede that defendant is entitled to the refund for 1966 and 1967 (subject to certain claimed deductions) and defendant concedes that plaintiff is entitled to the 1972 refund. Primarily at issue, then, are the conflicting claims for the 1968 to 1971 refunds. During the relevant guarantee years of 1968–1971 defendant, through a subsidiary, managed the premises and performed its duties, which included collection of rents and the payment of all charges, including real estate taxes. Under the lease such taxes constituted additional rent and were required to be paid by tenant, whether or not protested. Failure to pay the taxes could have involved serious and substantial consequences, such as default in and loss of the leasehold, imposition and foreclosure of a tax lien and the incurring of interest and penalties. The taxes were in fact paid as assessed. This reduced the net cash flow and, correspondingly, increased the

deficiency in each of the several guarantee years. Of the $474,435 in deficiencies paid, $226,346 are attributable to tax excesses. If the money is returned to defendant, which paid it honestly, involuntarily and under a mistake of fact and law (cf. *Adrico Realty Corp. v City of New York,* 250 NY 29), defendant will be made whole and plaintiffs will suffer no loss and will still have retained the full benefit of the cash flow guarantee. On the other hand, if, instead, the money is paid to plaintiffs, they will not only have the full performance of defendant's guarantee, but, in addition, will reap an unintended windfall and be unjustly enriched by money they never paid out in the first instance. The absence of a specific provision in the agreement covering these refunds is understandable; and should not prove fatal to defendant's claim. The 1966–1967 refunds covered by the agreement applied to a period when defendant (through its subsidiary) owned the leasehold and therefore had paid, or would necessarily be obligated to pay, the taxes. The 1968–1971 taxes, however, were obligations which arose after defendant ceased ownership. These obligations, then, would belong to the purchasing plaintiffs and, in the absence of a cash flow deficit, would not be paid by defendant. No one could foresee whether defendant would or would not have to pay a deficiency under its guarantee. Indeed, the parties anticipated positive cash flows during the guarantee years, as appears from the provision requiring the purchasers to pay 50% of net cash flow in excess of $180,000 to defendant to be applied first to prepaid interest (up to $1,800,-000) and then to principal of the promissory note evidencing the unpaid balance of the purchase price. In sum, were it not for the compulsion of the lease which required the erroneous taxes to be paid pending resolution of the protest proceeding, the taxes could or would have been initially paid only in the lower amount claimed to be correct by the tenant, the erroneous tax excess paid would not exist, would not have been part of the cash flow deficiency and would not have been paid by the defendant in the first place. In light of the foregoing, justice and equity dictates that, at the very least, the agreement should be reformed to reflect that defendant is entitled to that portion of the refund representing tax overpayments included in the deficiencies paid. In such connection, plaintiffs would be entitled to reimbursement for credits required to be given space tenants under subleases containing rent escalation clauses for rent overpayments made during the years in issue.