In the Matter of the Arbitration between ASSOCIATED GENERAL CONTRACTORS, NEW YORK STATE CHAPTER, INC., Respondent, and SAVIN BROTHERS, INC., Appellant.

Third Department, June 13, 1974.

*Goodstein, Zamore, Mehlman & Krones* (*Jacob I. Goodstein, Benjamin W. Mehlman* and *Robert E. Cohn* of counsel), for appellant.

*Bryant, O'Dell & Basso* (*La Verne F. O'Dell* of counsel), for respondent.

GREENBLOTT, J.   The Associated General Contractors (AGC) is a national trade association of individuals, firms, and corporations engaged in the construction industry, and the New York State chapter is the local organization serving AGC's members engaged in heavy and highway construction in New York State. Appellant Savin Brothers, Inc. is engaged in the heavy construction business of building, among other things, roads, bridges, and dams, and during the time in question, was engaged in the construction for the State of New York of a river front arterial project in the City of Albany.   Savin had been a member of AGC since February 8, 1958, but, following the expiration of a collective bargaining agreement negotiated by AGC with the Teamsters on behalf of the multi-employer group on March 31, 1972, and consequent strike on April 1, 1972 which lasted until June 3, 1972, it tendered its resignation from the organization on May 17, 1972.

The by-laws of AGC provided that, as a condition of membership in the association, any member who employs members of a craft with whom AGC negotiates must execute a current designation of bargaining agent agreement.   Pursuant to this by-law, Savin executed successive designations, with the designation covering the period involved herein having been executed on November 3, 1970.   The essence of these designations was to appoint AGC as sole and exclusive bargaining representative for the member firm for the period of time designated.   Each designating member further agreed to arbitrate any alleged breach of the agreement.   Included in the designations was a provision that, if the arbitrators should find that a signatory to the agreement violated its obligations under the agreement, damages shall be awarded to the AGC " in an amount no less than three (3) times the daily liquidated damage amount provided for in each such heavy and highway construction contract to which the [signatory] is a party within the geographic area of the applicable labor contract   *   *   *   negotiated by AGC " for each day that it was found to be in violation of its obligations under the designation agreement together with such other and further damages as the arbitrator in his discretion may determine.   Additionally, the designations provided that they shall

be binding on the signatory as long as it is a member of the association or until such time as it might withdraw from the association as required by law. Pursuant to the association's by-laws, no member could withdraw, resign or otherwise be relieved of its responsibilities under the designation unless such member gave notice at least 30 days prior to the commencement of collective bargaining negotiations. No such notice could be given during negotiations.

As heretofore noted, the collective bargaining agreements which AGC had negotiated with the five basic crafts in the State, including the Teamsters, expired on March 31, 1972. Both prior and subsequent to that date, AGC entered into negotiations with the bargaining units for the respective crafts. Appellant, as a member of AGC and signatory of a designation, was represented in these negotiations. On April 1, 1972 certain Teamsters' unions struck member firms including appellant. This strike continued until an agreement was reached on June 3, 1972. During the strike, appellant, on May 5, 1972, entered into an independent agreement with the Teamsters. On May 15, 1972, AGC notified appellant that appellant had allegedly breached its obligation under its designation, and that AGC and its members had been damaged thereby, and served a demand for arbitration. On May 17, 1972, appellant notified AGC that it was resigning as a member of the association effective immediately.

Following a hearing, the arbitrators found that appellant violated the designation agreement, which finding is not seriously disputed. Since notice of resignation was not permitted to be served during negotiations and on less than 30 days' notice, the period of violation was found to be 58 days, measured from May 5, 1972, the date of appellant's entry into its own agreement with the Teamsters, until July 2, 1972, the first day on which its resignation could have become effective pursuant to the by-laws. At the time of the breach, appellant had only one contract in the applicable geographic area, which contained a liquidated damage provision of $600 per day. Trebling this amount and then multiplying by the number of days of violation pursuant to the formula in the designation, the arbitrators awarded AGC damages in the sum of $104,400. The order and judgment appealed from confirmed this award.

It is not disputed that appellant breached its obligations, and we need not be long detained by appellant's contention that AGC and its members sustained no actual damage. This question of fact was resolved by the arbitrators against appellant, and we are powerless to review it. In any event, there is evidence tend-

ing to show that, as a result of appellant's withdrawal, the AGC's power at the bargaining table was diminished, resulting in a collective bargaining agreement less favorable than that which otherwise might have been obtained.

Appellant's main contention before Special Term and on this appeal is that the damage provision in the designation of bargaining agent imposes a penalty rather than fixes liquidated damages, and therefore contravenes public policy so as to be unenforceable even when awarded by arbitrators.

While the review of an arbitrator's award is a most limited one, and a mistake of law or fact will not justify vacation of an award, it has been said that this general rule does not apply where the arbitrator's award contravenes public policy or violates a State statute (see *Matter of Aimcee Wholesale Corp.* [*Tomar Prods.*], 21 N Y 2d 621). In the case at bar the arbitrators and the court at Special Term noted that the imposition of a penalty for a breach of contract is against public policy and that the courts have the power to vacate an award imposing a penalty (see *Matter of Publishers' Assn. of New York City* [*Newspaper and Mail Deliverers' Union of N. Y.*], 280 App. Div. 500), but held that the damage clause in the designation agreement should be treated as a provision for liquidated damages.

With the latter conclusion we cannot agree. It has long been the rule in this State that if the damage presumed to result from nonperformance of a contract is uncertain and incapable of exact ascertainment, the sum fixed by the parties is deemed to be liquidated damages and is recoverable as such, unless the sum stipulated to be paid by the defaulting party is, when interpreted as of the date of the agreement, grossly disproportionate to the presumable or probable damage, or to the readily ascertainable loss (*Ward* v. *Hudson Riv. Bldg. Co.,* 125 N. Y. 230; see also *Wirth & Hamid Fair Booking* v. *Wirth,* 265 N. Y. 214; *Seidlitz* v. *Auerbach,* 230 N. Y. 167; *City of Rye* v. *Public Serv. Mut. Ins. Co.,* 42 A D 2d 749). If the latter be the case, the courts " will treat it as a penalty and will relieve; on the principle that the precise sum was not of the essence of the agreement, but was in the nature of a security for performance " (*Ward* v. *Hudson Riv. Bldg. Co., supra.* p. 235).

As previously indicated, the damage provision contained in the designation of bargaining agent agreement imposed damages at three times the daily liquidated damage amount provided for in each heavy and highway construction contract to which the defaulting member was a party at the time of his breach together with such other and further damages as the arbitrator in his

discretion may determine. This amount, in our view, bears no reasonable relationship to the amount of damages which may be sustained by AGC and its members. While it can be presumed to be true, as AGC asserts, that the larger and more important the withdrawing member, the greater the damages are likely to be, the number of contracts to which a withdrawing party was a member at the time of breach and the amount of liquidated damages provided for in such contracts are variables which could not possibly have been anticipated at the time the designation agreement was entered into. The very essence of liquidated damages is that such damages be fixed; "if no specified sum has been agreed on there is no agreement for liquidated damages " (Encyclopedia, New York Law, Damages, § 81). Here the "liquidated" damages were to be dependent on two unpredictable variables which could differ from week to week, depending on the number of contracts still in effect at any given time and the terms thereof. Moreover, even if the two variable elements could with some reasonable degree of accuracy be predicted, it still does not appear how the daily liquidated damages payable for a contractor's breach of damages to an owner relates in any recognizable manner to the damages suffered by the association as the result of the withdrawal of such member; and any relationship that might exist becomes even more tenuous when the daily liquidated damage provision is trebled. Furthermore, the fact that the arbitrator was given power to impose damages in addition to those prescribed by the formula does nothing to diminish our view that at the time of execution of the designation, the " damage " presumed to result from a breach was totally incapable of reasonable estimation.

An understanding of the nature and purpose of the AGC and the restrictions imposed by its by-laws and the terms of the bargaining agent designations makes it clear that the damage clause must be construed as imposing a penalty. The AGC, as an association formed for the mutual protection and assistance of its members, cannot benefit as an entity except insofar as it can serve the objectives of its members. The converse is likewise true, that is to say, injury to the association is really injury to the members, for when and if a member does in fact commit a breach by withdrawing, the injury is a loss of bargaining power which had been achieved by banding together. As previously noted, the quantum of that loss will vary with the importance of the member, but the consequence will most likely be an immediate decline in the ability of AGC to negotiate collective bargaining agreements as favorable as might other-

wise have been obtained. Any measurement of such a loss is highly speculative to say the least, and the problem is complicated by the fact that the immediate loss of bargaining power is not the only element of injury. Perhaps the more severe long-term injury to such an association is the undermining of its unity, for labor unions, who sit at the other side of the bargaining table, are in effect put on notice that other individual members can be "picked off" as negotiations go on. The ultimate injury, of course, would be the destruction of such an association. Therefore, it would obviously be more important for AGC to deter withdrawal before it occurs rather than merely collect damages after the fact. Such deterrence is best achieved by requiring a breaching party to pay "damages" that are likely to be more costly than the perceivable benefits which might be obtained by withdrawing and negotiating individually. The collection of "mere" damages to compensate AGC for its loss could not have as great a deterrent effect as the imposition of a stiff penalty.

The question of whether a contract provision calls for the payment upon a breach of liquidated damages or a penalty being one of law for the court (see *Mosler Safe Co.* v. *Maiden Lane Safe Deposit Co.*, 199 N. Y. 479, 485), and the tendency of the courts in doubtful cases being "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages" (*City of New York* v. *Brooklyn & Manhattan Ferry Co.*, 238 N. Y. 52, 56), we conclude that the provision here in question provided for a penalty.

Having demonstrated the justification and need for a penalty in a case such as this, it would be folly to now hold that it could not be enforced because of a "public policy" which we do not feel was ever intended to govern in such situations. *Matter of Publishers' Assn. of New York City (Newspaper & Mail Deliverers' Union of N. Y.)* (280 App. Div. 500, *supra*), relied on for the proposition that an award of a penalty for breach of contract could not be made in arbitration because violative of public policy, was decided under former Civil Practice Act (§ 1448). Under that statute, the test of arbitrability was whether the controversy "may be the subject of an action." Thus, the court (p. 503) stated: "There is involved also the question whether the court must impose automatically the penalties privately agreed upon; or whether in a controversy in which it would not itself grant any such relief under any circumstances, the court might reserve the right not to feel required to do so in obedience to a private contractual arrangement."

In denying confirmation of the award, the court answered its question by noting (p. 507) that the " legal infirmity * * * attache[d] itself to the nature of the submission itself ", wherefore the parties could not obtain in arbitration that which could not be obtained by action.

With the adoption of CPLR 7501, providing that arbitration is enforceable " without regard to the justiciable character of the controversy ", that infirmity has, in our opinion, been removed. As early as 1952, when *Publishers' Assn.* was decided, it was noted that the effect of that decision was to " extend to arbitration agreements the penalty-liquidated damages distinction of traditional contract law ", but it was suggested that " even assuming that penalty awards should sometimes be reviewed, the peculiarities of arbitration cases seem to require more subtle distinctions and standards ". (Note, 52 Col. L. Rev. 943, 945.) Under CPLR 7501, " cases such as *Matter of Publishers' Assn.* (*Newspaper Union*) (*supra*) are of doubtful validity." (8 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 7510.07.) We agree that the proper question in *Publishers' Assn.* should have been whether " *the judicial policy prohibiting the imposition of penalties * * * is an overriding public policy sufficient to warrant interference with the award.* (Emphasis supplied.) Neither the collective-bargaining agreement nor the award itself was illegal, and the parties clearly had agreed to punitive damages. Moreover, there was no inequality of bargaining power, and in the labor situation the threat of severe penalties is important to prevent serious economic strife. Considering these factors, the public policy against punitive damages would appear to be insufficient to outweigh the definite public policy favoring arbitration." (Comment: " Judicial Review of Arbitration: The Role of Public Policy ", 58 Nw. U. L. Rev. 545, 554-555.)

This is not to say, of course, that every issue of broad public policy is at the mercy of an agreement to arbitrate, for as Professor McLaughlin has noted in his Supplementary Practice Commentary 1968 to CPLR 7501, " the courts will continue to assert exclusive sovereignty over controversies the resolution of which is invested with a *public interest transcending the concerns of the parties to the dispute.*" (Emphasis supplied.) (McKinney's Cons. Laws of N. Y., Book 7B, CPLR 7501, Supp., p. 146.) We feel that this restriction is appropriate and can properly be applied, for example, as a bar to the confirmation of arbitration awards which may result in the violation of State antitrust laws (see *Matter of Aimcee Wholesale Corp.* [*Tomar*

*Prods.*], 21 N Y 2d 621, *supra*) or other statutes enacted by the necessity to meet grave fiscal crises faced by the State and local governments (see *Matter of Associated Teachers of Huntington v. Board of Educ., Union Free School Dist. No. 3,* 40 A D 2d 122, 125). The "public policies" which are enforced in such cases are matters in which there is a public interest which needs to be protected. In *Matter of Aimcee Wholesale Corp. (supra),* the Court of Appeals went to great lengths to demonstrate the importance of the State's antitrust policy to the public as a whole, rather than relying upon a per se doctrine of public policy as a bar to arbitration, and in two cases decided prior to the enactment of CPLR 7501, the court confirmed arbitration awards so as to permit a result which "public policy" would have prohibited in a civil action. The first is *Matter of Ruppert (Egelhofer)* (3 N Y 2d 576), where the Court of Appeals confirmed an award by an arbitrator enjoining a work stoppage during a labor dispute although by "public policy" embodied in then section 876-a of the Civil Practice Act, the issuance of such an injunction by a court would have been prohibited. Comparing this policy with that favoring arbitration as a means of resolving disputes by special tribunals voluntarily created and vested with power by the parties themselves, the court noted that " each represents a separate public policy and by affirming here we harmonize those two policies " (p. 582). In the second case, *Matter of Staklinski (Pyramid Elec. Co.)* (6 N Y 2d 159), the court acknowledged that it had rejected a "public policy" argument in *Matter of Ruppert (Egelhofer) (supra),* and went on to hold that a public policy which might have served as a basis for refusing to grant specific performance of a personal services contract was not a proper basis for refusing to confirm an arbitrator's award directing specific performance of such a contract. In *Matter of Aimcee Wholesale Corp. (supra),* moreover, the Court of Appeals enumerated other "major State policies" over which the courts have enforcement powers which should not be taken away by parties agreeing to arbitration, but no mention is made of the public policy against contractual provisions for penalties vis-à-vis liquidated damages. While this is of course not conclusive, we are of the view that the public policy asserted in the present case is not vested with the same importance as those cited in *Matter of Aimcee Wholesale Corp. (supra),* for it serves no overriding public concern where parties of apparently equal bargaining power have voluntarily entered into an agreement which is now sought to be enforced. If anything, the policy here

invoked is of lesser importance than that invoked in *Matter of Ruppert* (*supra*), which the court determined should give way to the policy favoring arbitration. Since CPLR 7501 directs the courts to enforce awards "without regard to the justiciable character of the controversy" there is even less reason today to deny enforcement of awards based upon "public policies" which protect no discernible public interest in a particular case.

Moreover, the law recognizes the somewhat unique status of contracts in the labor field, including agreements governing the obligations of members of trade associations which, just as labor unions, are formed for the purpose of mutual protection and depend for their ability to perform their function upon the support of their membership. The loss of bargaining power resulting from a decline in membership, and the growing breach in the dike of membership cohesiveness can be damaging in a manner which can rarely if ever be measured in dollars and cents, and which is likely to grow in geometric proportion with each additional withdrawal.

Thus, for the same reasons which led us to conclude that the provision in question here imposed a penalty, we also must conclude that when arbitration is the means of policing collective bargaining and other labor agreements, "there may be a positive need for power in the arbitrator to impose and enforce a penalty * * *. The volatile nature of labor conflicts and the resulting economic waste frequently demand a stronger sanction than compensatory damages." (52 Col. L. Rev., *supra*, p. 945.) To hold that a provision for damages in agreements designating bargaining agents is unenforceable simply because of a questionable distinction between penalties and liquidated damages would take the teeth out of such agreements.

For all the above-stated reasons, we feel that the arbitrators' award, though clearly imposing a penalty, should be confirmed.

The judgment should be affirmed, without costs.

HERLIHY, P. J., (concurring). I am in agreement with the result reached in this particular case.

It is abundantly certain that in the present case the formula agreed upon by the parties for the ascertainment of damages constitutes a penalty. Trade association agreements as well as many portions of collective bargaining agreements would leave the parties without effective sanctions to discourage breaches thereof in the absence of penalties as in many instances actual damage would be suffered prior to any ability to secure injunctive relief and such damages would, for all practical purposes, not be subject to any accurate measure. It has been

held that in regard to trade association agreements and/or collective bargaining agreements, the fact that the formula adopted by the parties in regard to compensation for breaches of the contract constitutes a penalty does not violate public policy as long as such formula is specific. (See *Matter of East India Trading Co. [Halari]*, 280 App. Div. 420, affd. without opn. 305 N. Y. 866; *Matter of Mencher [Geller & Sons]*, 276 App. Div. 556.)

In the present case the formula set forth in the contract for damages is definite and certain and is reasonably related to the contractual relationship entered into between the parties. The award itself as calculated by the arbitrators was based upon an independent finding as to the length and extent of the default and it is demonstrated that the award is related to the breach contemplated by the parties at the time the agreement was entered into. Under the terms of the agreement, the arbitrators could have awarded much more substantial damages.

In *Matter of Publishers' Assn. of New York City (Newspaper & Mail Deliverers' Union of N. Y.)* (280 App. Div. 500) the penalty imposed by the arbitrators did not result from a formula specifically agreed upon by the parties and, as noted by the court therein, the imposition of punitive damages was in the unfettered discretion of the arbitrators. Actually, the *Publishers' Assn.* case was entirely different from the *Mencher* and *East India* cases and the result therein demonstrates that the imposition of a penalty should not be permitted where the same would depend upon that kind of discretion granted to the arbitrators.

If any general rule is to be drawn from the cases in regard to the public policy prohibiting the imposition of penalties and the waiver thereof as to trade association or collective bargaining contracts involving arbitration, it should be limited to permitting the imposition of penalties pursuant to formulas agreed upon by the parties in the contracts, it further being required that the penalty formula be reasonably related to the purposes of the agreement and the breach contemplated by the parties at the time the agreement was entered into.

The present case falls within that rule and, accordingly, I concur in the affirmance of the judgment.

SWEENEY, J. (dissenting). The pivotal issue on this appeal is whether the so-called " liquidated damage " provision of the designation of bargaining agent agreement calls for a penalty. We agree with the majority's reasoning and its conclusion on this issue. The damage clause imposes a penalty. We do not

agree, however, with the result reached by the majority and, therefore, dissent and vote to reverse.

It is well settled that our review is a limited one, and a mistake of law or fact by an arbitrator will not justify vacatur of an award. (*Matter of Burt Bldg. Materials Corp.* [*Local 1205, Int. Brotherhood of Teamsters*], 18 N Y 2d 556.) It is equally well established that where the arbitrator's award contravenes public policy the court has the authority to vacate it. (*Matter of Western Union Tel. Co.* [*ACA*], 299 N. Y. 177.) Our courts have held that the imposition of a penalty for a breach of contract is against public policy and have vacated an arbitration award which imposes a penalty as opposed to granting liquidated damages. (See *Matter of Publishers' Assn. of New York City* [*Newspaper & Mail Deliverers' Union of N. Y.*], 280 App. Div. 500, and cases cited therein.) Both Special Term and the arbitrators agree with these general principles, but concluded that the damage clause in question provided for liquidated damages and not a penalty. This conclusion was properly rejected by the majority. They would, nevertheless, affirm on the theory that the "public policy" against enforcement of penalty "provisions" should not apply in the instant case. With this conclusion we are unable to agree. It is unsupported by citation or authority, and contrary to existing precedent. In this arbitration award case where there is no correlation between the award and the actual damages sustained, we find no compelling reason for making an exception and not applying the established law. The cases cited in the concurring opinion are distinguishable. In our view, the penalty imposed herein calls for damages beyond actual loss caused by a breach which do not result from a formula but, on the contrary, are directed solely toward punishment, with discretion in the arbitrators to add more. To enforce this clause is against public policy, one which should not be treated lightly and taken away. The award, therefore, should be vacated and, since the respondent is limited to its actual damages, the matter remitted to the same arbitrators for a rehearing on the issue of damages. (CPLR 7511, subd. [c], par. [3]); see *Matter of Heymanson* [*Morgan & Bro.*], 276 App. Div. 837.)

STALEY, JR., J., concurs with GREENBLOTT, J.; HERLIHY, P. J., concurs in a separate opinion in which STALEY, JR., J., concurs; SWEENEY and REYNOLDS, JJ., dissent in an opinion by SWEENEY, J.

Judgment affirmed, without costs.