**HUNT LTD., Plaintiff–Appellee,**

**v.**

**LIFSCHULTZ FAST FREIGHT, INC.,
Defendant–Appellant.**

**No. 167, Docket 89–7466.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 19, 1989.

Decided Nov. 20, 1989.

Andrew J. Luskin, Great Neck, N.Y. (Paul H. Pincus, Peirez, Ackerman & Levine, Great Neck, N.Y., on the brief), for plaintiff-appellee.

Mitchell R. Berger, Washington, D.C. (Roger S. Ballentine, Patton, Boggs & Blow, Washington, D.C., on the brief), for defendant-appellant.

Before VAN GRAAFEILAND, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Lifschultz Fast Freight, Inc. ("Lifschultz"), appeals from a final judgment entered in the United States District Court for the Southern District of New York following a bench trial before John M. Walker, Jr., *Judge*, ordering it to pay $22,911.65, plus interest, to plaintiff Hunt Ltd. ("Hunt") as damages for breach of a contract that required Lifschultz to pay Hunt a fee for employee placement services. On appeal, Lifschultz contends, *inter alia*, that the district court erroneously found the contract's language unambiguous and failed to consider proffered extrinsic evidence of trade usage as to its meaning. Though we reject these contentions, we conclude, for the reasons below, that the judgment should be vacated and the matter remanded for further findings.

## I. BACKGROUND

Hunt is a personnel placement firm that searches for, refers, and places employees with various businesses. Lifschultz is a common carrier of goods for hire, conducting business throughout the United States. The events leading to the present controversy are undisputed.

In or about January 1987, Lifschultz engaged Hunt to search for candidates to fill sales representative positions within the company. The fee provision in ¶ 2 of the parties' negotiated agreement ("Agreement") stated, in pertinent part, as follows:

> Hunt, Ltd. agrees to diligently search for qualified sales representatives for Lifschultz Fast Freight and will earn a service fee on any representative so placed on the basis of two percent (2%) of the monthly booking of said sales representative for each month up to, but not exceeding, a period of twelve months.

Lifschultz paid Hunt a $1,000 advance to offset initial search expenses.

Following a search, Hunt referred Robert Opel to Lifschultz, and he was hired in March 1987 as a sales representative responsible for Lifschultz's Manhattan territory. Opel remained in that position until August 31, 1987.

During the period in which Opel was employed by Lifschultz, Lifschultz's revenues for its Manhattan territory totaled $1,195,561.18. Of that amount, $102,375.67 represented business from new customers found by Opel. For his services during the period, Lifschultz paid Opel a total of $11,000 in salary.

Hunt sought fees from Lifschultz, for its placement of Opel, in the amount of $55,126.17, representing two percent of projected revenues in Lifschultz's Manhattan territory for the one-year period following Opel's hiring by Lifschultz, net of the $1,000 advance already paid by Lifschultz. Lifschultz refused to pay, contending that Hunt was entitled to no more than two percent of the business from new customers found by Opel, less the $1,000 advance already paid, or $1,047.51.

Hunt commenced the present action against Lifschultz in New York state court. The action was removed to the district court and, eventually, the amount of damages demanded by Hunt was reduced to

$22,911.65, representing two percent of the total revenues of the Manhattan territory during the period of Opel's employment, less the $1,000 advance.

Prior to trial, the parties stipulated, *inter alia,* that "Opel was employed by defendant from March 31, 1987 through August 31, 1987 as a sales representative responsible for its Manhattan territory," and that the only issue to be tried was

> [w]hether the term "booking" in paragraph 2 of the contract ... means the revenues of defendant attributable to Robert Opel during his employment by defendant, irrespective of whether defendant's customers who generated such revenues had previously done business with defendant, or means the revenues of defendant solely attributable to new customers produced by Mr. Opel.

The case was submitted to the district court for decision on the basis of the written submissions. Prior to deciding the matter, the court asked the parties to submit additional evidence as to the meaning of the term "booking." In response, the parties submitted affidavits from industry executives and consultants. Those submitted by Lifschultz stated that the term "booking" meant only revenues from new accounts produced by the salesman. Those submitted by Hunt stated that "booking" meant not just revenues from new accounts but all revenues generated in the salesman's territory.

In a Memorandum and Order dated March 9, 1989, the court ruled in favor of Hunt. The court found that "[d]uring the term of his employment, Opel was the sole sales representative for Lifs[c]hultz's Manhattan territory." It also found, having consulted dictionary and industry-treatise definitions, that the term "booking" was broader than the interpretation urged by Lifschultz. Those reference works described bookings, in pertinent part, simply as reservations for transportation, and as the recording of arrangements for the movement of goods. The court found that the term "booking", as used in the contract, is explicit and unambiguous. In its context, the Court concludes, "booking" refers to the total revenues of defendant attributable to Opel during his employment by the defendant, whether those revenues resulted from "new" customers, new bookings, or "old" customers who entered into new contracts.

The court concluded that Hunt was entitled to receive two percent of all of Lifschultz's revenues from its Manhattan territory during the period of Opel's employment.

The court rejected Lifschultz's contention that narrow trade usage of the term "booking" precluded Hunt's recovery of the higher amount, ruling that "[a]s there is no ambiguity readily apparent within the contract, custom and usage [are] inappropriate as extrinsic evidence," and finding that even if such evidence were admissible, Lifschultz had not demonstrated that "its narrow definition of 'bookings' has been universally adopted." The court also rejected Lifschultz's contention that the language of the Agreement should be construed against Hunt as its draftsman, since it found that only one reasonable interpretation of the language at issue was possible.

Judgment was entered against Lifschultz in the amount of $22,911.65 plus interest, for a total of $27,012.25. This appeal followed.

## II. DISCUSSION

On appeal, Lifschultz contends principally that the district court erred in determining that the Agreement's language was unambiguous, in failing to consider the extrinsic evidence of trade usage proffered by Lifschultz, and in failing to find the Agreement unenforceable for lack of a meeting of the minds as to the meaning of the term "booking." In addition, Lifschultz contends that the court in effect granted summary judgment notwithstanding the existence of issues of fact. While we reject these contentions, we are not persuaded that the record justified the trial court's attribution of all of Lifschultz's Manhattan revenues to Opel. Accordingly, we vacate the judgment and remand for further consideration of the extent to which bookings for Lifschultz's Manhattan

customers were bookings attributable to Opel.

### A. The Procedural Argument

■ Lifschultz criticizes the district court's decision as to the meaning of the term "booking" as "in essence, a summary judgment type of disposition," that "should have [been] withheld ... until an appropriate record was assembled." We disagree with both the premise and the conclusion.

First, the record does not indicate that the court decided the present case as a matter of law. Though its ruling that the Agreement's use of the term "booking" was not ambiguous was a legal conclusion appropriate for summary judgment, its rulings as to Opel's role, the revenues of Lifschultz in Manhattan, and the revenues attributable to Opel were plainly findings of fact.

Second, the court did not err in deciding the meaning of the term "booking" without requesting more evidence. The court's statement that Hunt and Lifschultz had "agreed to try this case upon the submitted papers" was justified by the parties' express stipulation in the pretrial order that, with one exception not pertinent here, "[t]he parties agree[d] that the trial of this action should be based on this order and upon the pleadings as amended ...." We see no indication in the record that either party suggested to the district court that any witnesses or other documentary evidence was necessary in order for the court to decide the case.

■ While Lifschultz correctly states that the court need not accept the parties' view that the case is ripe for decision, and while, as discussed in Part II.C. below, there was a material gap in the record and findings, we conclude that the court did not err in concluding that no further evidence was required for a decision as to the meaning of the term "booking."

### B. The Meaning of "[B]ooking"

■ As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties. *See, e.g., Hartford Accident & Indemnity*

*Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973); *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 282 (1961); 4 S. Williston, *Williston on Contracts* § 600, at 280 (3d ed. 1961). "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985); *see United States Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044, 1048 (2d Cir.1989); *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); 3 A. Corbin, *Corbin on Contracts* § 554, at 222 (1960).

■ Contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978). Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957).

If the terms of a contract are unambiguous, the obligations it imposes are to be determined without reference to extrinsic evidence, *see Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1031 (1979); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709, 712 (1969), *modified on other grounds*, 26 N.Y.2d 969, 311 N.Y.S.2d 13, 259 N.E.2d 483 (1970), and trade

custom and usage is not admissible to contradict or qualify its provisions, *see Armour & Co. v. Celic*, 294 F.2d 432, 438 (2d Cir.1961); *Matter of Western Union Telegraph Co.*, 299 N.Y. 177, 184, 86 N.E.2d 162 (1949).

■ The district court properly applied these principles. The term "booking" as used in the Agreement is not ambiguous. The term has a commonly understood meaning in the context of freight carriage, one that has no connotation of limitation as to the identity or provenance of the customers whose reservations are accepted or for whom arrangements are made. The court properly rejected Lifschultz's contention that the term could reasonably be read as comprising only business obtained from new customers.

Since the term "booking" as used in the Agreement is unambiguous, the district court correctly declined to examine the evidence of trade usage in order to interpret the contract. While we would not endorse a suggestion that Lifschultz had the burden of proof in this matter or that it had some obligation to come forward with evidence that the interpretation it urged was "universally" accepted, we agree with the district court's conclusion that the trade usage evidence was not admissible on the interpretation issue.

■ Finally, we reject Lifschultz's argument that the judgment against it should be reversed on the ground that there was no enforceable contract. Its contention is that since it never meant to pay Hunt a fee based on any business from customers not introduced to Lifschultz by salesmen placed by Hunt, there was no meeting of the minds. This contention has no merit. Since the contested term was unambiguous, a contract was formed, whatever unexpressed intention Lifschultz may have had. *See Hayward v. Wemple*, 152 A.D. 195, 198, 136 N.Y.S. 625, 628 (2d Dep't), *aff'd without opinion*, 206 N.Y. 692, 99 N.E. 1108 (1912).

## C. *The Attribution of Bookings to Opel*

■ Though we agree with the district court that the meaning of the term "book-

ing" is clear, that conclusion does not resolve the controversy. We cannot affirm the district court's decision on the basis of the present record and findings, because the fact that all customer reservations are bookings does not mean that all Manhattan bookings were bookings attributable to Opel.

Hunt's compensation was not contractually defined with reference to territorial revenues. Rather it was linked to the salesmen Hunt placed. Thus, ¶ 2 of the Agreement did not provide that Hunt was to receive two percent of all of Lifschultz's bookings for the territory to which a salesman it placed was assigned; instead, it provided that Hunt was to receive two percent of the bookings "of" that salesman. Presumably, if Opel had taken a reservation from a customer from outside of New York, Hunt would seek a percentage of that booking. On the other hand, the term "booking[s] *of*" Opel (emphasis added) does not appear to entitle Hunt to a fee based on bookings even from within his territory, if they were attributable only to Lifschultz employees other than Opel. Thus the finding that bookings meant reservations by all customers, and not just new ones placed by Opel, answered only part of the question as to how much Hunt was entitled to be paid. The other part of that question was what bookings for Lifschultz's prior customers were bookings "of" Opel.

The district court appears to have reasoned that all of Lifschultz's Manhattan bookings were attributable to Opel because Opel was, during the period in question, Lifschultz's "sole" sales representative for Manhattan. We have two principal difficulties with this reasoning. First, though the district court stated that its decision was rendered "exclusively on the basis of the written record of pre-trial orders, amended pleadings and stipulated statements," its finding that Opel was the "sole" sales representative for Manhattan went beyond that record. The pretrial stipulation entered into by the parties, embodied in the pretrial order, stated that Opel was "*a* sales representative responsible for

[Lifschultz's] Manhattan territory." (Emphasis added.) There was no stipulation that Opel was the only sales representative for that territory.

Second, even if Opel was the only sales representative in the territory, that did not necessarily mean that only he generated bookings in that territory. In many businesses it is not uncommon to have certain accounts serviced by employees other than ordinary sales representatives. The pretrial stipulation on which the court relied does not in any way exclude the possibility that other employees may have been responsible for some of Lifschultz's Manhattan bookings.

In this regard, we note that Lifschultz submitted to the district court a pretrial memorandum stating that, though its practice was to have just one sales representative in a given territory at a given time, "other Lifschultz personnel including the company's officers engage in soliciting business within Manhattan." Thus, it argued that bookings arranged by these other persons could not properly be regarded as bookings of Opel. This unsworn representation was not, of course, evidence, and we see no indication in the record that Lifschultz made any effort to present admissible evidence of bookings made by others—either prior to trial or in any post-trial motion to reopen the record. Though Lifschultz's representation as to bookings made by others therefore was not part of the factual materials upon which the court could make its findings, we mention it simply because it is consistent with our view that the court erred in assuming that the stipulation that Opel was "a" representative in Manhattan meant that he was the sole person generating bookings in that territory.

We note further that "booking[s] *of*" Opel (emphasis added) might have any of several meanings. It might reasonably be interpreted to mean only reservations actually received by Opel. Or it could reasonably be interpreted to include accounts serviced by Opel, regardless of what Lifschultz employee actually received that customer's reservation. As noted by the affidavit of one of Hunt's consultants, "a new salesman in an existing sales territory must manage and service existing customer accounts in addition to those new accounts that he solicits ...." The present record, however, does not show that Opel took the reservations made by all of Lifschultz's Manhattan customers, or even that he had contact with all of them.

Nor does the record show any effort by the parties to develop the pertinent facts other than on an all-or-nothing basis. Thus, Hunt simply presented a page of Lifschultz's computer records showing a list of Manhattan customers with Opel's name at the top and argued that all Manhattan bookings were thus attributable to him. Though we might regard this as sufficient to support the granting of Hunt's entire claim if the findings indicated that the court had considered the possibility that the bookings actually attributable to Opel fell somewhere between all Manhattan revenues and only Opel's own newly-found customers, the court's memorandum decision does not persuade us that this possibility was considered. This is especially so in light of the court's apparent assumptions (a) that the parties' stipulation was that Opel was the "sole" sales representative in Manhattan, and (b) that only a sales representative receives bookings.

In sum, we find no error in the district court's conclusion that "booking" means reservations made by all customers, not just those made by new customers found by Opel, and we remand for a determination as to what portion of Lifschultz's bookings were bookings "of" Opel. The court may take such additional evidence as it deems appropriate. As trier of fact, the court is of course free to credit or reject any evidence that might come before it, including testimony that Opel had no contact with certain Manhattan customers and that Lifschultz employees other than Opel were responsible for bookings for those customers.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court and remand

for further proceedings not inconsistent with this opinion.

No costs.