**MELUN INDUSTRIES, INC., Plaintiff,**

**v.**

**Michael A. STRANGE, Defendant.**

**Michael A. STRANGE, Defendant and Third Party Plaintiff,**

**v.**

**S & C HOLDING COMPANY, INC., American Constructors, Inc., Brooks Erection & Construction Co., Inc., Mercury Management Co., Inc., S & C Equipment, Inc., and Strange & Coleman, Inc., Third Party Defendants.**

No. 90 Civ. 8265 (PNL).

United States District Court, S.D. New York.

Jan. 10, 1992.

---

Coudert Brothers, New York City (Wendy L. Addis, of counsel), for Melun Industries, Inc.

Martin S. Berglas, New York City, for Michael A. Strange.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiff, Melun Industries, Inc. ("Melun"), applies to confirm an arbitration award of $185,142 in its favor dated July 3, 1991 (the "Third Award"), to vacate an arbitration award of $28,564 in its favor dated March 27, 1991 (the "Second Award"), and moves to dismiss defendant Michael A. Strange's counterclaims against Melun. Strange applies to confirm the Second Award, to vacate the Third Award, and moves for summary judgment on his second counterclaim against Melun.

## BACKGROUND

This action concerns a dispute over adjustments to the purchase price of stock sold to Melun by Strange in 1986. On November 25, 1986, Melun and Strange entered into a Stock Purchase Agreement (the "Agreement") whereby Melun would purchase from Strange all the shares of S & C Holding Company ("S & C"). The purchase price was to be set at 80% of the audited book value of S & C as of August 31, 1986, as audited by Harrison H. Halby, independent certified public accountant for S & C, and as reviewed and accepted by Coopers & Lybrand ("C & L"), independent certified public accountant for Melun. The agreed upon figures were to be known as the "Original Book Value." Agreement ¶ 1(b). Melun was to pay 80% of the Original Book Value as the purchase price of S & C at closing. If C & L did not accept the figures provided by Halby, Melun had the right to terminate the Agreement. Agreement ¶ 13.

The Agreement provided that after closing an adjustment would be made to the purchase price to cover increase or decrease from the Original Book Value during the period from September 1, 1986 to the closing date, to the extent that the adjustment exceeded $60,000, according to the following procedures:

(i) As soon as possible after the Closing, [Strange and S & C] agree to deliver to [C & L] all documents necessary to permit said accountants to determine the amount, if any, by which the book value of [S & C] increased or decreased from the Original Book Value during the period from September 1, 1986 to the Closing Date. Within fifteen business days after receipt by said accountants of all such documents, [Melun] shall deliver to [Strange] a statement (the "Post–Closing Statement") prepared by said accountants either stating that no adjustment is required, or setting forth the amount of the adjustment, the basis therefor and the adjusted book value of [S & C] as of the Closing Date (the "Adjusted Book Value").

\* \* \* \* \* \*

(iii) The Post–Closing Statement shall be binding upon [both parties] for all purposes unless [Strange] gives written notice of dis-

agreement with the Adjusted Book Value within ten days after receipt by [Strange] of the Post–Closing Statement, specifying in reasonable detail the nature and extent of such disagreement. If [the parties] are unable to resolve any such disagreement within ten days after [Strange] gives [Melun] notice thereof, the disagreement shall be referred for final determination to [an accounting firm acting as arbitrator] ... [T]he determination of such accounting firm shall be conclusive and binding upon [the parties] for all purposes. [The parties] agree that judgment may be entered upon the determination of such accounting firm in any court having jurisdiction over the party against which such determination is to be enforced....

Agreement ¶ 1(d)(i), (iii).

In late November, 1986, Strange sent the August 31, 1986 financial statements to Melun's accountant, C & L, for review. Although C & L had doubts regarding the accuracy of the statement the closing took place on December 19, 1986.[1] The Original Book Value, as presented to Melun's accountants, yielded a purchase price for S & C at closing of $670,400.

On January 5, 1987, Strange sent C & L a copy of S & C's November 30, 1986 financial statement. On January 26, 1987, C & L sent Strange a document identified as a draft of an internal memorandum describing the nature and amounts of Melun's proposed adjustments ("January 26 memorandum"). The adjustments included "unadjusted book loss" in the amount of $83,676 ("Unadjusted Book Loss"). The memorandum did not explain the source of the figure for the Unadjusted Book Loss. The parties agree, however, that it was based on the difference between the total stockholder's equity as listed in the August 31, 1986 and in the November 30, 1986, financial statements. Melun asserts that $26,914 of the Unadjusted Book Loss was attributable to the loss of profitability of three contracts—"Amoco 6188CA,"

"Georgia Gulf 6901CA," and "Accurate 6129CL" (the "Three Contracts")—as between August and November.

On February 2, 1987, Strange responded to the C & L memorandum, objecting to all but a few of the proposed adjustments.

On May 6, 1987, Melun sent Strange a document purporting to be the "Post–Closing Statement" provided for by the Agreement ("Post–Closing Statement"). The categories of adjustments were largely the same as those in the earlier C & L memorandum, but several of the adjustments were increased dramatically in Melun's favor. The categories of adjustments in the Post–Closing Statement did, however, differ from the earlier memorandum in two respects. First, "Unadjusted Book Loss" was not listed as a category of adjustment. Second, an adjustment of $264,307 in Melun's favor was added for anticipated losses on long-term construction contracts.[2]

In a letter to Melun dated May 18, 1987 (the "May 18 letter"), Strange rejected the Post–Closing Statement as untimely under the terms of the Agreement and took the position that the January 26 memoranda was the post-closing statement called for by the Agreement. Strange accepted certain proposed adjustments that were in the January 26 memorandum (with slight modification), including the $83,676 Unadjusted Book Loss. Strange tendered to Melun a check in the amount of $160,458, which represented adjustments to which he agreed, less the $60,000 exclusion.[3] In a May 29, 1987 letter, Melun acknowledged that it had received but did not cash the check, indicating that it would be held "as a deposit towards amounts due." Melun contended that its Post–Closing Statement was timely, and that the delay in its issuance was due to Strange's failure to provide the financial information necessary to evaluate the November financial statement.

---

1. The parties agreed to treat November 30, 1986 as the closing date for the purposes of calculating the post-closing adjustment. Hence, the post-closing adjustment period runs from September 1, 1986 through November 30, 1986.

2. The contracts were Amoco 6188CA, Georgia Gulf 6901CA, Accurate 6157CL, and Kaplan 6900CA.

3. It appears that Strange inexplicably failed to deduct a $17,596 adjustment in his favor. That fact is of no significance for this opinion.

The parties proceeded to arbitration to resolve the disputed adjustments. The Saint Louis, Missouri office of KMPG Peat Marwick ("Peat Marwick") was selected as arbitrator, and Robert J. Graham became the partner responsible for exercising the arbitrator's duties.

On February 27, 1990, the arbitrator issued an award in favor of Melun in the amount of $519,018 (the "First Award"). After unsuccessfully seeking to have the arbitrator modify the First Award, Strange moved in this court to vacate the First Award on the grounds that (1) the arbitrator considered claims that were not timely raised under the adjustment provisions of the Agreement, and (2) the arbitrator exceeded the scope of his authority.

By Memorandum and Order dated November 9, 1990, this court held: (1) the May 6, 1987 Post–Closing Statement was timely and was properly considered by the arbitrator, but (2) the arbitrator exceeded the scope of his authority in rendering the First Award. The latter holding was based on the finding that the arbitrator had not limited himself to an examination of changes resulting from the events between August 31, 1986 and the closing, as required by the Agreement. Rather the arbitrator had undertaken to determine the true value of S & C at closing. Consequently, the First Award was vacated and the action was remanded to the arbitrator "to make findings as to increase or decreases in the book value resulting solely from the events of the period from August 31 to closing."

On March 27, 1991, Mr. Graham of Peat Marwick issued the Second Award in Melun's favor in the amount of $28,564. Of this amount, $26,914 was based on estimates of loss of profitability on the Three Contracts that Melun contends were accounted for in the Unadjusted Book Loss, namely, "Amoco 6188CA," "Georgia Gulf 6901CA," and "Accurate 6129CL." The arbitrator stated that "[w]e were presented with no convincing evidence that the profitability of any other contracts deteriorated solely from the events of the period from August 31, 1986 to closing."

In response to the Second Award, in a letter to Peat Marwick dated April 8, 1991, counsel for Melun stated:

Please be advised that our client, Melun Industries, Inc. is reviewing the award issued by Peat Marwick on March 27, 1991 and reserves the right to seek clarification and possible adjustment of several of the findings therein, in particular, the findings with respect to the contract profitability estimates, since our client is of the opinion that the evidence previously submitted supports a larger adjustment in favor of Melun.

The accountants for our client are reviewing the documents and, upon completion, we will be in contact with you.

On April 15, 1991, Strange's arbitration counsel wrote to Peat Marwick objecting to Melun's purported reservation of a right to seek modification of the Second Award and contended that the findings were unequivocal and supported by the evidence. On April 16, counsel for Strange wrote to Melun's counsel asserting the position that Melun's time to apply for modification of the Second Award had expired under applicable New York law, and that in any event there was no basis for modifying the Second Award.

On April 30, 1991, counsel for Melun wrote to Peat Marwick, challenging the Second Award as being based upon an erroneous application of this court's November 9, 1990, Memorandum and Order, and accordingly requesting that the Second Award be "reexamined" and "modified." On that date, Melun's accountant, C & L also submitted a letter to Peat Marwick presenting Melun's position on the post-closing adjustments.

Strange's arbitration counsel responded to these submissions by letter dated May 9, 1991, addressed to Peat Marwick. Strange took the position that (1) New York law governed any modification by the arbitrator of the Second Award, (2) the objections raised in Melun's April 30, 1991 letter were not timely and (3) there was no basis for modifying the award. Strange's arbitration counsel also represented that this letter was to serve as a formal objection to any modification of the Second Award.

Robert Graham who issued the First and Second Awards on behalf of Peat Marwick had retired around the time of the Second Award. Another Peat Marwick partner David Potter had since taken over the matter. On May 27, 1991, Potter informed Melun and Strange that in order to conclude the arbitration, additional materials could be submitted through June 21, 1991.

On July 3, 1991, David Potter issued the Third Award, which was in Melun's favor in the amount of $185,142. The arbitrator stated that the

> only difference in our findings from [the Second Award] is in the area of contract profitability estimates. After substantial review of the other matters, we have concluded that with respect to those matters, the findings in [the Second Award] are proper. The change in our findings in the contract profitability estimates is due to a more thorough understanding due to a better presentation of information. . . .

## DISCUSSION

### I. What Law Governs the Arbitrator's Modification of the Second Award?

 Strange contends that under the New York rules of procedure the arbitrator had no power under the circumstances to amend the Second Award and issue the Third. Melun disputes the applicability of New York procedural rules.

The parties agree that their respective applications to confirm and vacate are governed by the FAA. The FAA, which creates a procedural framework for enforcement of arbitration agreements involving contracts affecting interstate commerce, does not, however, specify rules governing the conduct of the arbitration itself. Strange contends that New York law, specifically CPLR Section

7509, governs the question of the arbitrator's authority to modify or vacate the Second Award. Melun contends that federal common law generated by the FAA applies.

Strange contends that New York arbitration law must govern the arbitrator's authority because the Agreement contains an explicit choice-of-law clause designating New York law. See Agreement ¶ 23 ("the parties hereto agree that this Agreement shall be governed by and construed, interpreted and enforced in accordance with the law of the State of New York"). This language is ostensibly a clear and unambiguous manifestation of the parties' intent that New York law govern all aspects of the Agreement, including conduct of arbitration under the Agreement.

Despite this unqualified choice-of-law clause, Melun contends that the parties really intended that federal law, and not New York's CPLR, govern the arbitration. Without addressing the language of the Agreement, Melun urges the court to divine the parties' true intention by looking at what the parties did, not what they said. But Melun does not contend (and I do not find) that the Agreement's choice-of-law provision is ambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (contract language is not ambiguous if it has a definite and precise meaning and concerning which there is no reasonable basis for difference of opinion). It is therefore unnecessary to examine extrinsic evidence of the parties' intentions. *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990) ("Parol evidence is admissible to aid in interpretation of a contract only when the language of the contract is ambiguous").[4]

Melun also argues that notwithstanding the parties' choice of law, this court must rely upon federal common law found in the

4. Even if this court were tempted to look beyond the four corners of the Agreement, I would not find that the parties possessed an intention contrary to the one manifest in the clear and unambiguous choice-of-law clause in the Agreement. Melun proffers as evidence of the parties true intent their invocation of the FAA and not New York's CPLR in prior stages of this proceeding. Melun's proof fails. Melun errs in assuming that the choice between the FAA and the CPLR is either/or. In fact, reference to the FAA for the rules governing the proceeding before a federal court is not inconsistent with invoking the CPLR in a proceeding before the arbitrator. The FAA and the CPLR are here applied to entirely different aspects of the arbitration process, the former governing the enforcement of arbitration agreements in federal courts, the latter governing the conduct of the arbitration itself.

penumbras of the FAA to determine whether an arbitrator has the authority to modify or vacate an award because the FAA somehow preempts the pertinent provisions of the CPLR. Melun is wrong. The FAA "contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 475, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989). Rather the FAA only preempts state law "to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Volt*, 489 U.S. at 477, 109 S.Ct. at 1255 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 66, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Applying these preemption principles to consideration of whether the FAA preempted state rules of arbitration that were chosen by parties pursuant to a contractual choice-of-law provision the Supreme Court stated that:

the FAA's primary purpose [is] ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate ... so too may they specify the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA

\* \* \* \* \* \*

*Volt*, 489 U.S. at 477, 109 S.Ct. at 1255 (emphasis added). Having found that the parties intended New York Arbitration rules to govern the arbitration, I further find that the reasoning of Volt leads to the conclusion that enforcing the arbitration rules under the law chosen by the parties is consistent with the FAA. Cf. *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117 (2d Cir.1991) (finding parties' choice of New York law was consistent with the FAA even where it pro-

duced a result contrary to federal arbitration law).

**II. Was the Arbitrator's Modification of the Second Award Consistent With Governing Law?**

The CPLR, which governs the rules of arbitration under the Agreement, specifies the circumstances under which an arbitrator can modify his award:

On written application of a party to the arbitrators within twenty days after the delivery of the award to the applicant, the arbitrators may modify the award upon the grounds that [ (1) there was a miscalculation of figures, or (2) the arbitrators awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted, or (3) the award is imperfect in a matter of form not affecting the merits of the controversy]. Written notice of the application shall be given to other parties to the arbitration. Written objection to the modification must be served on the arbitrators and other parties to the arbitration within ten days of receipt of the notice. The arbitrators shall dispose of any application made under this section in writing, signed and acknowledged by them, within thirty days after either written objection to modification has been served on them or the time for objection has expired, whichever is earlier. The parties may in writing extend the time for such disposition either before or after its expiration.

CPLR § 7509.

Strange contends that the Section 7509 requirements for modification of an arbitral award were not met in this case. First, Strange contends that Melun missed the deadline for seeking modification from the arbitrator. The Second Award was delivered on March 27, 1991 and an application for modification would have to have been made within twenty days, i.e., by April 16, 1991. The only submission from Melun to the arbitrator during that twenty day period was Melun's April 8 letter to the arbitrator. Strange contends that the April 8 letter did not constitute an application for a modification but rather stated only that Melun might

request a modification of the Second Award at some future date. The CPLR does not provide for the unilateral extension of the twenty day statutory deadline. Strange, contends that Melun did not make an application for modification until submission of the April 30 letter, two weeks after the statutory deadline.

Second, Strange contends that the arbitrator failed to dispose of the application within thirty days after Strange served an objection upon him. Strange's objections were served upon the arbitrator on May 9, 1991, giving the arbitrator until June 8, 1991 to address the application. The parties never extended that deadline. The Third Award was not rendered until July 3, 1991, almost one month after the statutory deadline.

Finally, Strange contends that the modification was not based on the narrow grounds permitted by the statute. Strange contends that the CPLR allows only for minor corrections and modifications, not for the sort of wholesale revision evident in the Third Award. See Weinstein, Korn & Miller, New York Practice—CPLR, ¶ 7509.01, pp. 75–215—75–216 ("a modification which merely corrects a minor matter, such as an award of interest, is permissible, while one which affects the merits is not").

Melun has not responded to these arguments in its written submissions nor during oral argument.

I find (for the reasons argued by Strange) that the modification of the Second Award was not in accordance with New York law. Melun did not apply for modification within 20 days. The arbitrator's modification was not timely. And the modification was a total revision of the reasoning of the earlier award, which is not permitted by § 7509. Consequently, the arbitrator's purported modification of the Second Award was unauthorized and the Third Award was a nullity.[5]

The FAA provides that a court may vacate an arbitration award "[w]here the arbitrators exceeded their powers or so imperfectly executed them that an ... [appropriate] award ... was not made." 9 U.S.C. § 10(d). Because the Third Award was an impermissible modification of the Second Award, Strange's motion to vacate the Third Award should be granted.

**III. Should the Second Award be Vacated or Confirmed?**

■ The question remains whether the Second Award should be vacated or confirmed. Melun contends that the Second Award must be vacated for two reasons. Neither of Melun's arguments is meritorious.

First, Melun contends that in rendering the Second Award the arbitrator exceeded the scope of his power by deciding an issue not submitted—the loss of contract profitability on the Three Contracts attributable to unadjusted book loss. The Second Award recognized a loss of profitability on the Three Contracts in Melun's favor for a total of $26,914. Melun contends that the loss of profitability on the Three Contracts was already accounted for in the category of Unadjusted Book Loss that was accepted by Strange in his May 18, 1987 letter. Melun contends that because this loss was not disputed by Melun, and only disputed adjustments were to be submitted to arbitration under the Agreement, see Agreement ¶ 1(d)(iii), the arbitrator exceeded the scope of his authority in considering it.

In sum, Melun contends that because the arbitrator improperly awarded it $26,914 too much, the entire Second Award must be

---

5. If this court were to apply federal common law, as Melun has urged, the conclusion would be the same. Under common law, once an arbitrator has rendered a final award, he becomes functus officio and may not revisit his decision. See, e.g., *Trade & Transport v. Natural Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir.1991) ("once arbitrators have finally decided the submitted issues, they are, in common-law parlance, 'functus officio,' meaning that their authority over those questions is ended"); *A/S Siljestad v. Hideca Trading, Inc.*, 541 F.Supp. 58, 61 (S.D.N.Y.1981), aff'd per curiam, 678 F.2d 391 (2d Cir.1982) ("after a final decision by an arbitrator, the arbitrator becomes functus officio and lacks the power to reconsider or amend the decision"); see generally G. Wilner, Domke on Commercial Arbitration § 22.01 (1984). Some states (such as New York) have followed the lead of the Uniform Arbitration Act of 1955 and have departed from the common law by statute to permit limited modification of an award by the arbitrator. See F. Elkouri & E. Elkouri, How Arbitration Works 284 (4th ed. 1985).

scrapped, and all issues, including those that were properly decided by the arbitrator, thrown open to reexamination. The argument goes too far. The FAA is designed to enforce arbitration agreements, not thwart them. Even if the arbitrator exceeded his authority in considering the issue that led him to award Melun $26,914, Melun would not be entitled to have the Second Award vacated in toto. At best Melun would be entitled to vacatur of that portion of the Second Award that was beyond the arbitrator's authority, that is, the part that granted Melun $26,914, leaving the remainder of the award intact. See, e.g., *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117 (2d Cir. 1991) ("portion of the award [granting punitive damages in excess of arbitrator's authority] should have been vacated by the district court pursuant to 9 U.S.C. § 10(a)(4)"). Needless to say, Melun is not asking to vacate the award to it of $26,914, the only part of the Second Award it claims was rendered in excess of the arbitrator's authority.

In addition, Melun contends that the Second Award should be vacated because it did not decide the submitted issue of contract profitability estimates on contracts other than the Three Contracts. Melun's argument is unfounded. The arbitrator did rule on these issues. On the issue of contract profitability estimates, the Second Award states:

The contract progress reports made available to us indicated that the profitability on three contracts (Amoco—6188, Georgia Gulf—6901, and Accurate—6129) deteriorated by $26,914 during the period from August 31, 1986 to November 30, 1986. We were presented no convincing evidence that the profitability of any other contracts deteriorated solely from the events of the period from August 31, 1986 to closing. According-

ly we find in favor of Strange in the amount of $237,952 and in favor of Melun in the amount of $26,914.

Second Award at 2 (emphasis added). The clear inference from this statement is that the arbitrator considered the submitted issue of contract profitability estimates in full, but determined that Melun was not entitled to an adjustment on the other contracts, beyond the Three Contracts on which the award was rendered.[6] Melun's contention that the arbitrator did not rule on the submitted issue of contract profitability is merely wishful thinking.

Melun has presented no reason for vacating the Second Award.[7] Strange's motion for an order confirming the Second Award must be granted. 9 U.S.C. § 9 ("the court must grant [an application for an order confirming an arbitration award] unless the award is vacated, modified, or corrected"); *Ottley v. Schwartzberg*, 819 F.2d 373, 375 (2d Cir.1987) ("the district court must grant a petition to confirm an arbitration award if it properly is brought ... unless one of the statutory bases for vacating or modifying the award is established"). Melun's motion to dismiss Strange's first counterclaim (seeking to confirm the Second Award) must be denied.

### IV. Strange's Second Counterclaim

Although Strange acknowledges his obligation to pay Melun $28,564 under the Second Award, he seeks summary judgment refunding $83,676 out of the $160,458 that he paid to Melun, as undisputed, with his May 18 letter. The $83,676 which he seeks to have refunded pertained to Unadjusted Book Loss. Netting his obligation ($28,564) with his alleged entitlement to refund ($83,676), he asks summary judgment in the amount of $55,112.[8] He contends his concession of this

---

6. This impression is reinforced by the Third Award which states that it differed from the Second Award on the issue of contract profitability "due to a more thorough understanding due to a better presentation of information," not because the issue had previously been left undecided.

7. Melun has not, in the alternative, sought modification of Second Award, pursuant to 9 U.S.C. § 11.

8. The adjustments paid for by Strange were the Farmlands writeoff ($75,395), unrecorded liabilities ($39,537), Eichleay adjustments ($21,850), and Unadjusted Book Loss ($83,676), which equals $220,458. A $60,000 cushion was deducted pursuant to the terms of the Agreement, making $160,458.

obligation by his May 18 letter should not be binding, as it was made on the incorrect understanding that the Melun's January 26, 1987, draft constituted the only valid post-closing statement, rather than its May 6, 1987 submission. He contends he made the concession only on the assumption that it would settle those issues. Because the court ruled against him, allowing Melun's May 6, 1987 Post–Closing Statement, he contends he should be relieved of his concession that was based on an assumption that the court rejected. Strange also contends the Unadjusted Book Loss could not be an undisputed adjustment within the meaning of the Agreement because it was not asserted by Melun in its May 6 Post–Closing Statement.

Melun counters that it is entitled to summary judgment dismissing Strange's second counterclaim because Strange accepted adjustments of $160,458 in the May 18 letter, including an adjustment for Unadjusted Book Loss in the amount of $83,676.[9]

Melun concedes that $26,914 of the Second Award representing adjustments on the Three Contracts was already paid by Strange to Melun as part of the Unadjusted Book Loss. If Melun were to retain the $26,914 it already received for the Three Contracts as part of the Unadjusted Book Loss, as well as $26,914 for the same item as part of the Second Award, it would reap an unjustified double recovery on the same adjustment. Therefore, even if Melun is correct in asserting that Strange conceded the Unadjusted Book Loss, Strange is entitled to an adjustment protecting him from paying the same adjustment twice.

■ There remains $56,762 in dispute. Melun contends this liability was conceded by Strange's May 18 letter and accompanying check. Strange contends it was neither a binding concession, nor an undisputed item according to the adjustment procedures prescribed by the agreement.

Although Strange is correct in arguing that this adjustment did not result from the prescribed adjustment process, his argu-

ments do not overcome—at least at the summary judgment stage—Melun's contention that this amount was removed from the dispute by agreement of the parties, regardless whether the agreement was done in the manner prescribed by the governing contract. Strange is therefore not entitled to summary judgment as to the remaining $56,762.

Nor has Melun shown that it is entitled to summary judgment for this amount. It is not clear beyond dispute that Melun reached agreement with Strange on the proposed adjustment for Unadjusted Book Loss. In its May 6 Post–Closing Statement, Melun identified three adjustments from Strange's February 2, 1987 letter as "mutually agreed to" and "resolved." It did not mention the Unadjusted Book Loss.

It remains unclear whether Melun is entitled to retain $56,762 out of Strange's May 18, 1987 payment or Strange is entitled to have it refunded. As to that amount, summary judgment must be denied to both sides.

It is clear, however, that Strange is obligated to Melun in the amount of $28,564, as awarded in the Second Award, and that, upon making such payment, Strange would be entitled to the return of $26,914 from his May 18, 1987 payment to avoid double payment.

The Second Award is hereby confirmed, obligating Strange to pay Melun $28,564.

Partial summary judgment is granted to Strange for the refund of $26,914 out of his May 18, 1987 payment to Melun.

Setting off these two items, Strange must pay $1650 to Melun.

There remains a triable issue as to which party is entitled to $56,762 paid by Strange to Melun on May 18, 1987.

## CONCLUSION

1. Strange's application to confirm the Second Award and vacate the Third Award is granted.

---

9. Melun also moved for dismissal of the second counterclaim pursuant to Fed.R.Civ.Pro. 12(b)(6). However, Melun's argument in sup-

port of its motion to dismiss was based on the incorrect assumption that the Second Award could not be confirmed.

2. Melun's application to confirm the Third Award and vacate the Second Award is denied.

3. Strange's motion for summary judgment on the second counterclaim is partially granted as to $26,914, and otherwise denied.

4. Melun's motion to dismiss Strange's counterclaims is denied.

**SO ORDERED.**