14-3191-cv (L)
APEX Employee Wellness Services, Inc. v. APS Healthcare Bethesda, Inc.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of February, two thousand eighteen.

PRESENT:
> **GUIDO CALABRESI,**
> **JOSÉ A. CABRANES,**
> **RAYMOND J. LOHIER, JR.**
> *Circuit Judges.*

─────────────────────────────────

**APEX Employee Wellness Services, Inc.,**
> *Plaintiff-Appellee-Cross-Appellant*,

**Summit Health, Inc.,**
> *Plaintiff*,

> **v.**                                      **14-3191-cv (Lead),**
>                                              **17-398-cv (XAP),**
>                                              **17-645-cv (Con),**
>                                              **17-770-cv (XAP)**

**APS Healthcare Bethesda, Inc.,**
> *Defendant-Appellant-Cross-Appellee*.

─────────────────────────────────

**FOR PLAINTIFF-APPELLEE-CROSS-APPELLANT:**   JEFF E. BUTLER (John P. Alexander, *on the brief*), Clifford Chance US, LLP, New York, NY.

**FOR DEFENDANT-APPELLANT-CROSS-APPELLEE:** ZACHARY D. ROSENBAUM, Lowenstein Sandler LLP, New York, NY.

Appeal from the United States District Court for the Southern District of New York (Ramos, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

In 2010, APS Healthcare Bethesda, Inc. entered into an agreement with the State of Tennessee to provide health care services to state employees. As part of this arrangement, APS agreed to hold health screening clinics at locations across the state beginning in January 2011. APS, in turn, subcontracted this task to Summit Health, Inc.

In December 2010, a series of emails were exchanged between Troy Watson (APS's point person for communications with Summit) and Jason Moczul (Summit's point person for communications with APS). In these emails, Watson provided Moczul with a tentative list of dates and locations for more than one hundred clinics that APS wanted Summit to hold in the first half of 2011. In response, Moczul asked Watson to provide him with "expected participation" figures for those clinics so that Summit would "know how many staff would be needed in each site." J.A. 1124. Watson provided these estimates, but cautioned that they were "probably high." J.A. 1141.

Summit began holding clinics in January 2011, despite the fact that the parties had not yet finalized an agreement memorializing the terms of their subcontracting relationship. Soon after the clinics began, it became obvious that Watson's participation estimates were, in fact, far too high, often more than doubling actual attendance.

2

Then, in early March 2011, Summit realized that it had been improperly providing APS access to its screening results—which included confidential health information about the state employees involved—without the two companies having first entered into a formal confidentiality agreement. Summit immediately cut off APS's access to its screening database and indicated that it would not restore access until the parties had finalized their contract. The parties quickly executed an agreement on March 15, 2011 (with an explicitly retroactive effective date of January 1, 2011), and Summit duly restored APS's access to its screening information.

The provisions of the contract relating to fees (Exhibit B) specified that APS would pay Summit $37 for each screening that it performed. However, Exhibit B also included a section on "Standard Minimums," which provided that, for a given clinic, Summit would in no event be paid less than as if it had performed the greater of "40 screenings, or 90% of Customer projection." J.A. 67.

Two days after signing the agreement, Summit alerted APS that it understood this language to permit it to use Watson's participation estimates as APS's "Customer projections." That is, Summit intended to bill APS for each clinic by multiplying $37 by the largest of three numbers: (i) 40; (ii) 90% of Watson's participation estimate; and (iii) the actual number of screenings performed. Because Watson's estimates far exceeded actual attendance, Summit was seeking payment for more than twice as many screenings as it had actually performed.

APS expressed immediate alarm. The next day, March 18, APS employee Bob Hines directed Summit to cease relying on the Watson estimates and begin instead using the number of online appointments that had been made for each clinic as APS's "Customer projections." And beginning in April 2011, Watson alerted Moczul that APS would no longer provide Summit with

3

participation estimates for upcoming clinics. In response, Moczul informed Watson that Summit would refuse to schedule any future clinics until it had received participation estimates for them. Watson ultimately relented, providing "uniform estimate[s] of either 100 (for clinics in large cities) or 75 (for clinics not in large cities)," which were far more accurate than the estimates he had provided back in December. J.A. 1118.

All in all, Summit performed nearly 50,000 screenings in the first six months of 2011, but invoiced APS for more than 60,000 additional screenings pursuant to its interpretation of the "Standard Minimums" provision. APS promptly paid Summit $37 for all screenings the company had actually performed, but withheld the portion of Summit's requested compensation attributable to these "Standard Minimums."

On December 30, 2011, Summit (which later assigned its claim to APEX Employee Wellness Services, Inc.) brought a breach of contract action against APS in the Southern District of New York. The district court granted partial summary judgment to Summit, holding (i) that the term "Customer projection" unambiguously referred to participation estimates provided by APS and (ii) that the Watson estimates plainly met that description. The district court also rejected a litany of contractual defenses asserted by APS, including equitable estoppel, breach of contract, breach of the covenant of good faith and fair dealing, and no meeting of the minds.

The district court, however, set for a jury trial the issue of whether Summit was entitled to continue using Watson's estimates following APS's March 18, 2011 email directing Summit to cease using them. The jury ultimately returned a verdict for APS on this issue.

Both parties seek relief from this Court. APS argues that the district court erred in holding that the relevant language in the agreement was unambiguous, in rejecting its various contractual

4

defenses, and hence in ordering it to pay Summit's requested pre-March 18 billings. For its part, APEX cross-appeals the district court's decision to send to the jury the question of whether Summit could continue using the Watson estimates as "Customer projections" following Hines's email on March 18. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We affirm in full the judgment of the district court. APS's primary argument is that the Watson estimates cannot qualify as "Customer projection[s]" because they were made *before* Summit started holding its clinics, whereas a projection is a forecast "based on *present* trends." APS Br. at 36 (emphasis added). We find this argument unpersuasive. Watson indicated in his deposition that he calculated his participation estimates by ascertaining the number of state employees who resided in the area surrounding each planned clinic and multiplying that figure by the percentage of those employees he predicted would ultimately attend the clinic. That sort of calculation falls comfortably within the common usage of the word "projection." And, in any event, the words "projection" and "estimate" were used interchangeably in the relevant provisions of Exhibit B, and there can be no serious dispute that Watson's "participation estimates" were at least *estimates*.

We also affirm the district court's rejection of APS's various defenses to performance under New York contract law. Because Summit substantially performed on its obligations under the agreement, and because any injury APS suffered can be attributed to its inaccurate participation estimates and misinterpretations of unambiguous contractual language, APS cannot avail itself of any of the defenses asserted. *See, e.g.*, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274,

5

1278 (2d Cir. 1989); *Da Silva v. Musso*, 53 N.Y.2d 543, 552 (1981). We have also considered APS's remaining arguments and consider them to be without merit.

Finally, we reject APEX's cross-appeal of the district court's determination that APS created a factual dispute as to whether Summit was entitled to use the Watson estimates when calculating "Standard Minimums" for clinics held after March 18, 2011. Nothing in the agreement between Summit and APS specified *how* APS was to arrive at its participation estimates. There was therefore a question of fact as to whether, after March 18, Summit should (as the jury found) have used the number of online appointments for each clinic as APS's "Customer projections" or whether Summit could have instead continued to rely on the Watson estimates.

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

6